**COPPERWELD CORP., UNR–Leavitt, Div. UNR, Inc., and Welded Tube Co. of America, Plaintiffs,**

v.

**UNITED STATES and United States International Trade Commission, Defendants,**

**Titan Industrial Corp., Defendant–Intervenors.**

**Court No. 86–03–00338.**

United States Court of International Trade.

Feb. 24, 1988.

Schagrin Associates (Roger B. Schagrin and Paul W. Jameson, Washington, D.C., on the motion) for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Kevin Horgan, on the motion) and Lyn M. Schlitt, Gen. Counsel, Michael P. Mabile, Asst. Gen. Counsel, U.S. Intern. Trade Com'n (Jack M. Simmons, III and Edwin J. Madaj, Jr., Washington, D.C., on the motion), for defendants.

Dow, Lownes & Albertson (William Silverman, Leslie H. Wiesenfelder, and Michael P. House, Washington, D.C., on the motion), for defendant-intervenor.

Dewey, Ballantine, Bushby Palmer and Wood (Michael H. Stein, Washington, D.C., on the motion), for the amicus curiae, Lone Star Steel Co., Inc.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiffs, Copperweld Corp., UNR–Leavitt, Div. UNR, Inc., and Welded Tube Company of America move for judgment on the agency record pursuant to rule 56.1(c)(1) of the Rules of this Court. Plaintiffs challenge the final negative determination by the International Trade Commission (ITC or Commission) in *Heavy–Walled Rectangular Welded Carbon Steel Pipes and Tubes from Canada,* Inv. No. 731–TA–254 (Final), USITC Pub. No. 1808 (February, 1986) [*Rectangular Pipes and Tubes from Canada (Final)*]. The ITC determined that the U.S. industry producing this product was not being materially injured or threatened with material injury by reason of the imports of this product from Canada.

Plaintiffs advance several arguments in support of their motion. Plaintiffs contend that the ITC is prohibited from considering the dumping or LTFV margin as a discretionary "other factor" in an injury determination. They urge that some Commissioners decline to examine evidence of price underselling. Plaintiffs also contend that one of the Commissioners applies an erroneous causation analysis. Finally, plaintiffs argue that there is insufficient evidence in the record for the determination that the domestic industry was neither materially injured nor threatened with material injury by reason of the imports from Canada.

For the reasons that follow, the Court finds the determination of the ITC in *Rectangular Pipes and Tubes from Canada (Final)* is supported by substantial evidence in the record and otherwise in accordance with law. Plaintiffs' motion for judgment on the agency record is therefore denied.

## FACTS

On March 25, 1985, a petition was filed on behalf of the structural tubing subcommittee of the Committee on Pipe and Tube Imports and the individual producer members of that subcommittee including the plaintiffs. The petitioners alleged that imports of heavy-walled rectangular welded carbon steel pipes and tubes from Canada (H–WR) are being or are likely to be sold in the United States at less than fair value (LTFV) and that these imports are materially injuring or threatening material injury to a United States industry.

On April 15, 1985, the International Trade Administration (ITA) initiated a LTFV investigation. *Certain Heavy-Walled Rectangular Welded Carbon Steel Pipes and Tubes from Canada; Initiation of Antidumping Duty Investigation*, 50 Fed.Reg. 15771 (April 22, 1985). The ITC thereupon issued a preliminary determination that imports of H–WR are materially injuring a U.S. industry. *Heavy–Walled Rectangular Welded Carbon Steel Pipes and Tubes from Canada*, Inv. No. 731–TA–254 (Preliminary), USITC Pub. No. 1691 (May, 1985) [*Rectangular Pipes and Tubes from Canada (Preliminary)*].

One of the companies investigated was the defendant-intervenor, Titan Industrial Corp. (Titan). Titan, the largest importer of the subject merchandise, and a U.S. company, accounts for approximately 80% of the imports of the product under investigation. Titan purchases steel coil in Canada, converts the coil into finished H–WR, and sells the H–WR in the United States. Titan does not sell the finished H–WR in Canada.

Notice of the ITA's preliminary negative determination was published on September 10, 1985. *Certain Heavy–Walled Rectangular Welded Carbon Steel Pipes and Tubes from Canada; Preliminary Determination of Sales at Not Less Than Fair Value*, 50 Fed Reg. 36910 (Sept. 10, 1985). The ITA determined that a dumping margin of 0.47% for Titan and 0.10% for Acier Royalcor Steel, Inc. (Royalcor) were *de minimis*.

On November 22, 1985, notice of the ITA's final affirmative determination was published. *See Certain Heavy–Walled Rectangular Welded Carbon Steel Pipes and Tubes from Canada; Final Determination of Sales at Less Than Fair Value*, 50 Fed.Reg. 48238 (Nov. 22, 1985). The dumping margin for Titan was found to be 0.65%.[1]

Following a hearing before the Commissioners, the ITC voted 5–1 that an industry in the United States is not materially injured or threatened with material injury by reason of the imports of H–WR from Canada.

In the final determination, the views of a plurality of Commissioners, Chairwoman Stern, Vice Chairman Liebler, and Commissioner Brunsdale were published as a single opinion.[2] These Commissioners based

---

1. A *de minimus* dumping margin of 0.15% was found for Royalcor. Plaintiffs are not contesting the part of the determination pertaining to Royalcor.

2. The vote of three of six Commissioners constitutes a plurality sufficient to support an affirmative determination. *See* 19 U.S.C. § 1677(11).

their determination primarily on the lack of any causal connection between the imports from Canada and the condition of the domestic industry. *Rectangular Pipes and Tubes from Canada (Final), supra,* at 3. They determined that there was no material injury by reason of imports and made the following findings:

> In determining whether there is material injury to the domestic industry "by reason of" the imports subject to the investigation, the Commission must consider, among other factors, the volume of imports, the effect of the LTFV imports on prices in the United States for the like product, and the impact of such imports on the relevant domestic industry. In this investigation, we find that there is no material injury by reason of the imports. This conclusion rests principally on findings of: no significant increase in import market share in an expanding market; no significant impact on prices; increases in U.S. production, domestic shipments, and capital expenditures; and the extremely low weighted average dumping margin found by the Department of Commerce.

*Rectangular Pipes and Tubes from Canada (Final), supra,* at 8–9 (footnotes omitted). The concurring views of Commissioners Lodwick and Rohr were also published in a separate opinion. While generally agreeing with the plurality's conclusion that the domestic H–WR industry is not materially injured or threatened with material injury by reason of H–WR imports from Canada, Commissioners Lodwick and Rohr concluded that the U.S. industry is experiencing material injury. They emphasized that the information does not "support the conclusion that Canadian imports are a *cause* of material injury to the domestic industry." *Id.* at 23 (emphasis supplied).[3]

## BACKGROUND

In a final antidumping duty investigation, the ITC is directed to ascertain whether:

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded, by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a)(1) of this section.

19 U.S.C.A. § 1673b(d) (1980 & Supp.1986). Material injury is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C.A. § 1677(7)(A) (1980).

In an investigation under § 1673d(b), the ITC is required to consider the following factors, among others:

(i) the volume of imports of the merchandise which is the subject of the investigation,

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

19 U.S.C.A. § 1677(7)(B) (1980). In evaluating the volume, price effects, and impact on the domestic industry of the imports, the ITC must consider the following:

(i) **Volume.**—In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) **Price.**—In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise

---

**3.** Commissioner Eckes filed a dissenting opinion.

would have occurred, to a significant degree.

**(iii) Impact on affected industry.**—In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

**(I)** actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

**(II)** factors affecting domestic prices, and

**(III)** actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C.A. § 1677(7)(C) (1980).

By contrast, in an evaluation of *threat* of material injury, the ITC must consider the following relevant economic factors, among others:

**(I)** If a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement),

**(II)** any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

**(III)** any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

**(IV)** the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

**(V)** any substantial increase in inventories of the merchandise in the United States,

**(VI)** the presence of underutilized capacity for producing the merchandise in the exporting country,

**(VII)** any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury, and

**(VIII)** the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 1671 or 1673 of this title or to find [sic] orders under section 1671e or 1673e of this title, are also used to produce the merchandise under investigation.

19 U.S.C.A. § 1677(7)(F)(i) (1980 & Supp. 1986). A determination of threat of material injury must be based on evidence that the threat of injury is "real and that actual injury is imminent." The determination may not be based on mere conjecture or supposition. 19 U.S.C.A. § 1677(7)(F)(ii) (1980 & Supp.1986). *See also American Spring Wire Corp. v. United States*, 8 CIT 20, 28 n. 8, 590 F.Supp. 1273, 1281 n. 8 (1984).

If the ITC makes a final negative determination of material injury or threat of material injury under § 1673d, review on the record is available in this Court within 30 days from the date on which the final determination is published in the Federal Register. 19 U.S.C.A. § 1516a(a)(2) (1980 & Supp.1986). This Court must hold unlawful any determination, finding, or conclusion found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S. C.A. § 1516a(b)(1)(B) (1980).

## DISCUSSION

*I. LTFV Margin*

Referring to the plurality opinion of Commissioners Stern, Liebeler, and Brunsdale, the plaintiffs and *amicus* contend the ITC is prohibited from considering the dumping margin in an injury determination.[4] In support of this argument, the

---

4. In their briefs, the plaintiffs and *amicus curiae* use the term "margins analysis" loosely to connote the consideration of the margins given by Commissioners Stern, Liebeler, and Brunsdale. There are, however, several definitions of the term "margins analysis." Assuming margins

plaintiffs and *amicus* rely upon the plain language of § 1677(7) which requires the ITC determine whether material injury is by reason of the imports. They contend that the ITC actually ruled that there was no material injury by reason of *dumping*. Plaintiffs and the *amicus* challenge reliance upon the legislative history of the 1979 Act and the Subsidies and Antidumping Codes to justify use of margins in an injury determination. Plaintiffs also urge for pragmatic reasons that dumping margins should not be a factor in the analysis.

By contrast, both the defendant and the defendant-intervenor maintain that the ITC is permitted to consider the dumping margin as an "other factor" in assessing the effects of the imports on the domestic industry. They rely upon the principle that an agency charged with administration of a particular law is given broad discretion to construe a law that is silent or ambiguous on a specific issue. *See Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

The first issue involves the extent of reliance placed upon the dumping margin by Commissioners Stern, Liebeler, and Brunsdale. Plaintiffs and *amicus* urge that in actuality the Commissioners did not consider the dumping margin a factor to be taken into account. Rather, they assert, the Commissioners ruled that there was no material injury by reason of the dumping. In essence, they argue, the Commissioners ignored the requirement to base a finding of injury on the imports as the statute requires. In support of this argument plaintiffs allude to the following sentences at page 14 of the opinion:

> With a dumping margin of only 0.65 percent, the price of the imported product would have increased in the absence of LTFV sales at almost 65 cents for every $100.00 of imports. Given this extremely low dumping margin, a very special set of circumstances would have to exist in the domestic market for imports to cause injury to the domestic industry. Such special circumstances are not found in this investigation.

*Rectangular Pipes and Tubes from Canada (Final), supra,* at 14 (footnote omitted).

■ When considered in the context of the entire plurality opinion, these sentences provide little support for the view the plurality ignored the requirement to base a finding of injury on the *imports* as the statute requires. The opinion clearly provides that Commissioners Liebeler, Stern, and Brunsdale recognized the need to consider, among other factors, the volume of imports, the effect of the LTFV imports on prices in the U.S. for the like product, and the impact of the imports on the domestic industry. *See id.* at 8–9. The plurality determined there was no material injury by reason of the imports. *Id.* at 9. They based this conclusion on several causal factors, one of which was the extremely low weighted average dumping margin found by the Department of Commerce. *Id.* The Court accepts the defendant's explanation that "[t]hese Commissioners added to that analysis, as an additional factor, consideration of the LTFV margin, which they considered in the market context of this case, and examined the size of the LTFV margin as *a gloss on their analysis of pricing factors.*" Brief of Defendants at 30, *Copperweld Corp. v. United States and United States International Trade Commission,* Court No. 86-03-00338 (footnote omitted) (emphasis supplied).[5]

analysis requires a comparison between the margin of dumping and the margin of underselling as urged by the plaintiffs and *amicus,* the Court does not find the plurality utilized this type of analysis. The opinion of Commissioners Stern, Liebeler, and Brunsdale, does not use the term "margins analysis." There is also no reference to the margin of underselling which is a requisite element in the type of "margins analysis" referred to by the plaintiffs and *amicus.* Hence, the Court declines to adopt the term "margins analysis" when referring to the analysis utilized by the plurality. Furthermore, since the Court holds that the plurality did not engage in "margins analysis," there is no need to address the specific arguments made by the parties against the use of "margins analysis."

**5.** As will be discussed below, there is sufficient support in the legislative history for consideration of the dumping margin to analyze the price effects of the imported product.

Plaintiffs and the *amicus* contend that the ITC is prohibited from considering the dumping margin in an injury determination. They urge that consideration of the margins is completely irrelevant to the analysis. Whether or not the ITC is *permitted* to consider margins, it is clear that Congress has not mandated consideration of dumping margins in an injury determination.[6] *See Maine Potato Council v. United States*, 9 CIT 293, 297–99, 613 F.Supp. 1237, 1241–43 (1985). This Court has even held that since "neither the statute nor those parts of the legislative history cited by [the parties] specifically prohibit the use of margins analysis as a factor in determining injury[,]" the ITC may consider margins as a factor in determining injury. *See Hyundai Pipe Co. v. United States International Trade Commission*, — CIT —, —, 670 F.Supp. 357, 360 (1987).

Section 1677(7)(B) provides that the ITC "shall consider *among other factors*," the volume of imports, the effect of imports on prices for the like product in the U.S., and the impact of the imports on domestic producers of like products. Congress did not specify what other factors may be considered. Congress chose to leave the matter to the discretion of the ITC:

> [T]he Commission must satisfy itself that, in light of all the information presented, there is a sufficient causal link between the less-than-fair-value imports and the requisite injury. The determination of the ITC with respect to causation is, under current law, and will be, under section 735, complex and difficult, and is a matter for the judgment of the ITC.

S.Rep. No. 249, 96th Cong., 1st Sess. 75, *reprinted in*, 1979 U.S. Code Cong. & Admin. News 381, 461. In this regard, when a statute is ambiguous with regard to the meaning of a particular term, a reviewing court must defer to a reasonable agency interpretation of that term:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Young v. Community Nutrition Institute*, 476 U.S. 974, 980, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986) (quoting *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted)).

It is therefore essential to refer to extraneous sources to ascertain the reasonableness of the agency's interpretation that the dumping margin may be considered as an "other factor" in an injury determination.[7] Section 1677(7)(C)(iii) expressly pro-

---

6. The Court observes that if Congress had intended mandatory consideration of dumping margins in an injury determination, Congress would have included this factor as a requisite element of § 1677(7)(B) as it did with volume and price.

7. Plaintiffs contend that the opinion of three commissioners does not constitute "agency interpretation." However, in establishing the United States International Trade Commission (formerly the U.S. Tariff Commission), Congress created a scheme whereby six commissioners appointed by the President, by and with the advice and consent of the Senate would comprise the central decision-making body of the agency. 19 U.S.C. § 1330(a) (1980). Congress specified that each of the commissioners would possess the requisite knowledge to exercise expertise in administering the duties and functions of the agency. *Id.* Congress recognized that these commissioners might not concur in rendering decisions. *See, e.g.*, 19 U.S.C. § 1330(d). Congress specified that the vote of three of six commissioners would constitute a plurality sufficient to support an affirmative determination. *See supra* note 2. To hold that

vides that in examining the impact on the affected industry, the ITC "shall evaluate all relevant economic factors which have a bearing on the state of the industry...." The Committee Report evinces congressional endorsement of the ITC's practice of considering the dumping margin a relevant factor in assessing the impact of the imported product on the domestic market:

> In determining whether injury is "by reason of" less-than-fair-value imports, the ITC now looks at the effects of such imports on the domestic industry. The ITC investigates the conditions of trade and competition and the general condition and structure of the relevant industry. It also considers, among other factors, the quantity, nature, and rate of importation of the imports subject to the investigation, *and how the effects of the margin of dumping relate to the injury, if any, to the domestic industry.* Current ITC practice with respect to which imports will be considered in determining the impact on the U.S. industry is continued under the bill.

S.Rep. No. 249, 96th Cong., 1st Sess. 74, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 461 (emphasis added). It appears the ITC could reasonably conclude that the dumping margin has some relevance in this regard. This is particularly true since plaintiffs have failed to persuade the Court that the dumping margin is irrelevant to the analysis. *See* 28 U.S.C. § 2639(a)(1) (1982).[8] Furthermore, although legitimate concerns against the use of the dumping margin have been expressed, they are insufficient to establish a legal bar to the exercise of discretion by a commissioner.

The legislative history of the 1979 Act makes it manifestly certain that Congress vested the ITC with broad discretion to determine what other factors may be considered in making an injury determination:

> In determining whether an industry is materially injured, as that phrase is used in the bill, the ITC will consider, to the extent permitted by information submitted to it in a timely manner, the factors set forth in section 771(7)(C) and (D) *together with any other factors it deems relevant....* It is expected that in its investigation the Commission will continue to focus on the conditions of trade, competition, and development regarding the industry concerned. For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant. Similarly, for one type of product, price may be the key factor in making a decision as to which product to purchase and *a small price differential resulting from the amount of the subsidy or the margin of dumping can be decisive;* for others, the size of the differential may be of lesser significance.

S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 474 (emphasis added). The logical inference from this passage is that, while Congress has vested the ITC with broad discretion to determine what other factors may be considered, the margin of dumping may be a relevant factor in assessing the effects of the price of the imported product in the domestic market.

Plaintiffs argue that if dumping margins were intended by Congress to be considered, Congress would have provided for

---

agency action can never be taken unless all of the commissioners or more than three of six commissioners concur is tantamount to disregard for the delicate scheme devised and implemented by Congress.

**8.** This subsection provides in pertinent part:
"[I]n any civil action commenced in the Court of International Trade ... under section 516A of the Tariff Act of 1930, the decision of ... the International Trade Commission is presumed to be correct. The burden of proving

otherwise shall rest upon the party challenging such decision.
28 U.S.C.A. § 2639(a)(1) (1980 & Supp.1986). Plaintiffs contend that the dumping margin and the margin of underselling measure two totally different matters and are calculated for different periods of time. While there may be some merit to these arguments, they are more properly directed to the weight of the evidence before the ITC. Neither argument demonstrates the irrelevance of the dumping margin to the analysis.

different consideration of this factor in a preliminary investigation. It bears repeating, however, that Congress did not mandate consideration of margins in a final investigation. *See Maine Potato Council,* 9 CIT at 297–99, 613 F.Supp. at 1241–43. Nevertheless, the ITC is empowered to assign to a factor a varying degree of significance depending upon the facts of a particular case:

> The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and *the significance to be assigned to a particular factor is for the ITC to decide.*

S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 474 (emphasis supplied). *See also Maine Potato Council,* 9 CIT at 300, 613 F.Supp. at 1244. Although the Court does not decide this issue, it appears that the ITC could assign to the dumping margin alleged in the petition such weight as is appropriate under the circumstances.[9]

Plaintiffs contend that the revised Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, *opened for signature* April 12, 1979, 31 U.S.T. 4919, T.I.A.S. No. 9650 (entered into force Jan. 1, 1980) [Antidumping Code or Code] [10] does not authorize consideration of the dumping margin. The *amicus* contends that the Antidumping Code cannot be interpreted to require consideration of the margins.

Plaintiffs' principal concern focuses upon a footnote at the end of the discussion regarding the dumping margin in the opinion of Commissioners Stern, Liebeler, and Brunsdale. The footnote refers to a memorandum from the Director of the Office of Economics which allegedly supports consideration of margins in an injury determination.[11] According to the plaintiffs, the analysis in the memo is erroneous.

Plaintiffs argue that the memo relies upon one phrase in art. 3, paragraph 4 of the Antidumping Code to support its thesis. This phrase, plaintiffs assert, conflicts with the remainder of the Code which consistently utilizes the language effects of the "dumped *imports.*" [12] Article 3, para-

9. In arguing that consideration of the LTFV margin is inconsistent with or irrelevant to the factors enumerated at § 1677(7), plaintiffs and *amicus* appear to rely upon the doctrine of *ejusdem generis.* This doctrine provides that "where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are ... to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary 464 (5th ed. 1979). Plaintiffs and *amicus* therefore urge that since the LTFV margin is not within the class defined by the statute, i.e. volume, price, and impact of the imports, the ITC is prohibited from considering the margin. *Ejusdem generis,* however, does not apply if there is a clear manifestation of a contrary legislative intent. *See* 2A N. Singer, Sutherland Stat. Const., § 47.22 (4th ed. 1979). *See also Sawhill Tubular Div. v. United States,* 11 CIT ——, ——, 666 F.Supp. 1550, 1555 (1987). As indicated above, Congress intended the ITC be given broad discretion to determine what "other factors" may be considered by the agency in an injury determination.

10. The Antidumping Code is a revised or second version of the Agreement on Implementation of Article VI of the General Agreement on Tariffs

and Trade, *opened for signature* June 30, 1967, 19 U.S.T. 4348, T.I.A.S. No. 6431, 651 U.N.T.S. 320 (entered into force July 1, 1968). For a discussion of the relationship between the first and second Codes, *see* E. McGovern, International Trade Regulation 334–35 (2d ed. 1986).

11. The footnote provides: "The Memorandum from Director, Office of Economics, EC–J–010 (January 7, 1986) provides an interesting general discussion of some economic factors and methodology relating to title VII." *Rectangular Pipes and Tubes from Canada (Final), supra,* at 14 n. 33. From this language, the Court observes that the extent of reliance placed upon this memorandum is questionable.

12. Among the provisions utilizing this language are the following:

1. A determination of injury for purposes of Article VI of the General Agreement shall be based on positive evidence and involve an objective examination of both (a) the *volume of the dumped imports and their effect on prices* in the domestic market for like products, and (b) the consequent *impact of these imports* on domestic producers of such products.

Antidumping Code, *supra,* art. 3, para. 1 (emphasis added).

graph 4 utilizes the term "through the effects of dumping" as follows:

4. It must be demonstrated that the dumped imports are, through the *effects of dumping*, causing injury within the meaning of this Code. There may be other factors which at the same time are injuring the industry, and the injuries caused by other factors must not be attributed to the dumped imports.

Antidumping Code, *supra*, art. 3, para. 4 (footnotes omitted) (emphasis added).

The footnote after "effects" in paragraph 4 provides: "As set forth in paragraphs 2 and 3 of this Article." According to the plaintiffs, paragraphs 2 and 3 follow the language of 19 U.S.C. § 1677(7)(C) of the Act and accordingly permit consideration of only the volume of the imports, the price of the imports compared to the domestic prices of the product, and the impact of the imports on the domestic industry.

The *amicus* urges that the Antidumping Code does not require consideration of the margins. In *Hyundai Pipe Co. v. United States International Trade Commission*, — CIT at —, 670 F.Supp. at 360–61 (1987), this Court concluded that, since article 3, paragraph 2 did not refer to margins, the Code did not *mandate* consideration of margins in an injury determination.

The plaintiffs urge that the Code *prohibits* consideration of the LTFV margin. Although plaintiffs are correct that the language of article 3, paragraph 3 follows the language of § 1677(7)(C)(iii), the language contained in both provisions authorizes the consideration of all relevant factors having a bearing on the state of the industry. Article 3, paragraph 3 contains an enumeration of factors to be considered in assessing the impact of the imports on the industry and provides that the list is not exhaustive:

5. The *effect of the dumped imports* shall be assessed in relation to the domestic production of the like product when available data permit the separate indentification of production in terms of such criteria as: the production process, the producers' realizations, profits. When the domestic production of the like product has no separate identity in these

3. The examination of the impact on the industry concerned shall include an evaluation of *all relevant economic factors and indices having a bearing on the state of the industry* such as actual and potential decline in output, sales, market share, profits, productivity, return on investments, or utilization of capacity; factors affecting domestic prices; actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital or investments. *This list is not exhaustive*, nor can one or several of these factors necessarily give decisive guidance.

Antidumping Code, *supra*, art. 3, para. 3 (emphasis added).

Since the language of this article closely follows the language of 19 U.S.C. § 1677(7)(C)(iii) to the extent of allowing consideration of all relevant economic factors, the Court holds that there is no conflict between § 1677(7)(C) and the Antidumping Code. *See also United States Steel Corp. v. United States*, 9 CIT 453, 457, 618 F.Supp. 496, 500–01 (1985) (referring to the Trade Agreements Act of 1979 and the Subsidies Code, "the objective of G.A.T.T. consistency was embodied in the Act"). In considering the LTFV margin one of the relevant economic factors affecting the domestic industry, Commissioners Stern, Liebeler, and Brunsdale acted in accordance with the Antidumping Code.

Plaintiffs contend, however, that while there have been several determinations under the Antidumping Act of 1921 in which margins analysis was used, margins analysis has been rejected by a majority of the Commissioners as well as a former General Counsel of the ITC. In support of this argument, plaintiffs allude to *Certain Carbon Steel Products From Spain*, Inv. Nos. 701–TA–155, 157–60, 162 (Final), USITC Pub. 1331 (December, 1982). Plaintiffs cite

terms the *effects of the dumped imports* shall be assessed by the examination of the production of the narrowest group or range of products, which includes the like product, for which the necessary information can be provided.

*Id.* art. 3, para. 5.

a portion of the opinion of the then Chairman Eckes and Commissioner Haggart which provides in pertinent part as follows:

The statute does not direct the Commission to consider the amount of the net subsidy in determining whether there is material injury. At most, the amount of the net subsidy is a factor which the Commission may consider under section 771(7)(B) of the Act.

*Id.* at 14. The Court finds this determination is no bar to consideration of the dumping margins (or net subsidy) as a discretionary factor under § 1677(7). On the contrary, the cited passage confirms the position of this Court that consideration of the margins is neither required nor proscribed by the governing statute. As previously discussed, Commissioners Stern, Liebeler, and Brunsdale considered the LTFV margin as a permissible "other factor" in their analysis of material injury to the domestic industry. Their interpretation of the relevant statute is entitled to great weight. *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir.1984).

■ Plaintiffs also urge that the former General Counsel of the ITC rejected the use of margins analysis in a memorandum to Commissioner Stern. Although the Court deems a memorandum from a former official of an agency charged with administration of a statute to be persuasive authority, such a memorandum cannot be held an official pronouncement by the agency of the meaning of that statute. Furthermore, it appears that the former General Counsel did not state that consideration of the margin would be unlawful. He merely stated his position that "the amount of the margin is not an important *factor* in a Commission determination." Memorandum GC–E–065 (March 17, 1981). The memorandum therefore does not conflict with the view that the ITC may but is not required to consider the LTFV margin in its analysis of material injury. That the General Counsel finds this factor not entitled to much weight does not affect this conclusion.

Both the defendant and defendant-intervenor take the position that Congress was aware of the ITC's established practice of considering the size of the dumping margin as a factor in its analysis and endorsed this practice in the 1979 Act. The *amicus* contends that there were two separate types of "margins analysis" prior to the passage of the 1979 Act and that therefore Congress did not know and could not have known which practice it was endorsing. Assuming the *amicus* is correct that there were two types of margins analyses, in a considerable number of cases during this timeframe, the ITC considered the dumping margin a factor in its analysis. Congress understood that in analyzing the effects of the LTFV imports, the ITC considers "among other factors ... how the effects of the margin of dumping relate to the injury, if any, to the domestic industry." S.Rep. No. 249, 96th Sess. 1st Sess. at 74, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 460. Congress intended this practice be continued "with respect to which imports will be considered in determining the impact on the U.S. industry...." *Id.*

## II. Price Underselling

In evaluating the effect of the imports on prices, Congress has required the ITC to consider whether "there has been *significant* price undercutting by the imported merchandise as compared with the price of like products of the United States...." 19 U.S.C. § 1677(7)(C)(ii)(I). There is little indication of what Congress intended by use of the term "significant price undercutting." It is clear however, that Congress has vested the ITC with broad discretion "to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council,* 9 CIT at 300, 613 F.Supp. at 1244.

During the investigation in the case at bar, the ITC requested price data from United States producers and importers concerning the largest sale in each quarter for each of the four product specifications sold to both end users and service center/ distributors. The ITC compared domestic producers' prices with the prices of all Canadian imports and with Titan's prices.

On the basis of this data, Commissioners Stern, Liebeler, and Brunsdale determined that price trends for the Canadian and the domestic market behaved similarly throughout the period of investigation. *Rectangular Pipes and Tubes from Canada (Final), supra,* at 10. They also found that there was no overall pattern of underselling by the Canadian product. *Id.* at 10–11. Commissioners Lodwick and Rohr arrived at similar conclusions:

> Our examination of pricing factors, as required by statute, indicates that Canadian imports have not had a price depressing or suppressing effect. We note that there is no pattern of consistent Canadian underselling of the domestic industry. There are instances of both underselling and overselling, which supports the information gathered by Commission investigators that this is a very competitive market. The information also indicates that domestic producers have most frequently been the price leaders in this market. Rather, data from purchasers indicate that prices for imports from Canada are as likely to be higher than domestic prices as they are to be lower.

*Id.* at 23.

Referring to the plurality opinion of Chairwoman Stern, Vice Chairman Liebeler, and Commissioner Brunsdale, plaintiffs contend that Commissioners Liebeler and Brunsdale unlawfully departed from § 1677(7)(C)(iii)(I) by not considering evidence of underselling. According to the plaintiffs, Commissioners Liebeler and Brunsdale believe that only in the instance of apparent predatory pricing would there be actual underselling. Plaintiffs urge that such a conclusion is flawed.

Of immediate concern to the plaintiffs is a footnote to the plurality's finding of no overall pattern of underselling by the Canadian product:

> Vice Chairman Liebeler and Commissioner Brunsdale believe that evidence of underselling is ordinarily not probative on the issue of causation. They do not find the particular data on underselling gathered by the Commission useful.

Chairwoman Stern believes that evidence of underselling should be used only with caution.

> In this case, we note that the relevant products are not usually the same (i.e. homogeneous) for different suppliers. Hence prices received by different suppliers are expected to vary and price differences among firms can persist over time. Thus, the observed price differences among firms are not helpful in analyzing causation. *See* Memorandum from Director, Office of Economics, EC–J–010 (January 7, 1986), at 8–22.

> Vice Chairman Liebeler's views are more fully set forth in Certain Table Wine from the Federal Republic of Germany, France, and Italy, Invs. No. 701–TA–258–60 and 731–TA–283–85 (Preliminary), USITC Pub. 1771 at 34–36 (1985) (Additional Views of Vice Chairman Liebeler).

*Rectangular Pipes and Tubes from Canada (Final), supra,* at 11 n. 25. In challenging this footnote, plaintiffs refer to the authorities cited by the Commissioners.

The Court agrees with the plaintiffs that § 1677(7)(C)(iii)(I) by its very terms requires the ITC, in evaluating the effects of imports on prices to consider whether "there has been *significant* price undercutting by the imported merchandise as compared with the price of like products of the United States. . . ." *Id.* (emphasis added). Congress recognized, however, that the significance of the various factors affecting an industry would depend upon the facts of each case. S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 474. Congress therefore chose to give the ITC broad discretion in analyzing and assessing the significance of the evidence on price undercutting. *Id.*

■ Contrary to the plaintiffs' allegation, the Court finds the Commissioners did not ignore the evidence of underselling. As required, they considered this evidence and found no overall pattern of underselling by the Canadian product. *Rectangular Pipes and Tubes from Canada (Final), supra,* at 10–11. That the Commissioners

stated that "evidence of underselling is ordinarily not probative on the issue of causation," and "that evidence of underselling should be used only with caution," does not render the determination invalid. The ITC has discretion to assign relative significance to a particular factor. Both statements are directed to the weight of the evidence of underselling presented. The statements do not imply that the evidence of underselling was ignored.

Furthermore, given the power to assign relative weight to the significance of the evidence of undercutting, the defendant's explanation as to why evidence of underselling must be used cautiously is not a post-hoc rationalization. It is consistent with the view that the ITC can exercise discretion in assessing the factors germane to the analysis.

Plaintiffs argue, however, that there is insufficient evidence in the record to support the ITC's conclusions regarding price undercutting. As previously stated, this Court is bound to sustain a final injury determination unless it is "unsupported by substantial evidence on the record, or is otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). This standard is universally recognized to comprise the following:

"[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 [71 S.Ct. 456, 459, 95 L.Ed. 456] (1951), *quoted in Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 22 (1st Cir.), *cert. denied*, [464 U.S. 892], 104 S.Ct. 237 [78 L.Ed.2d 228] (1983). *Accord Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20 [86 S.Ct. 1018, 1026, 16 L.Ed.2d 131] (1966). Taking into account " 'whatever in the record fairly detracts' from the [agency's] fact finding as well as evidence that supports it,["] *Penntech, supra*, 706 F.2d at 22 (quoting *Universal Camera, supra*, 430 U.S. at 487–88 [71 S.Ct. at 464]), "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....* ' " *Id.* at 22–23 (quoting *Universal Camera, supra*, 340 U.S. at 488 [71 S.Ct. at 465]).

*American Spring Wire Co*, 8 CIT at 22, 590 F.Supp. at 1276.

■ In applying this standard, the Court finds there is ample evidence in the record to support the ITC's findings with regard to "significant price undercutting" by the Canadian product. All five of the Commissioners in the majority found that the evidence concerning price undercutting was "mixed." When the ITC has found a "mixed pattern" of price underselling information, the ITC has found that the statutory standard of significant price undercutting has not been met. *See, e.g., Certain Carbon Steel Products From Austria and Sweden*, Inv. Nos. 701–TA–225, 227–28, 230–31 (Final), USITC Pub. 1759 at 12–13 (September, 1985) (negative determination based on mixed pattern of overselling and underselling); *Carbon Steel Structural Shapes From Norway*, Inv. No. 731–TA–234 (Final), USITC Pub. 1785 at 10 (November, 1985).

■ Plaintiffs further argue that the information on prices to service centers should not have been weighed equally with prices to end users. In the plaintiffs' view, proportional weighting would result in a finding of significant price undercutting by the Canadian product. Plaintiffs also urge that the ITC should have taken into account the volume of the sales transactions under investigation. According to the plaintiffs, if the ITC had compared the total dollar value of the underselling by the Canadians to the total dollar value of their overselling, the ITC would have found significant price undercutting. However, neither the governing statute nor its legislative history require the ITC to adopt any particular analysis when the market consists of several segments. Furthermore, since it does not appear that plaintiffs argued before the ITC that a sectoral analysis should be conducted, though they were

aware of the underlying facts, plaintiffs may not make this argument for the first time in this Court. *See, e.g.,* List No. 1 of the Administrative Record, Pub. Doc. 51 at A–20 n. 2, *Copperweld Corp. v. United States,* Court No. 86–03–00338 [Pub.Doc.]. With regard to the volume of the sales transactions under investigation, plaintiffs have not cited any authority which requires the ITC conduct such an analysis.

As its final challenge of the ITC's findings regarding price underselling, plaintiffs criticize the pricing calculations made by the ITC. Plaintiffs maintain that the ITC should have factored into the analysis, the value of freight absorption and other services offered by Titan on the Canadian product. In the plaintiffs' view, these factors are additional costs which should be quantified so that the prices measured reflect the true level of underselling.

■ It has been held that the relevant statutory provision neither mandates nor authorizes cost analysis or adjustment of prices for cost factors:

First, 19 U.S.C. § 1677(7)(C)(ii)(I), which requires the Commission to consider whether "there has been significant price undercutting by the imported merchandise as compared with the price of like products in the United States" focuses solely on *prices* and does not mandate any *cost* analysis or adjustment of prices for cost factors respecting the purchase of the imported product. Ignoring the plain language of the statute, which as mentioned above focuses solely on actual prices, plaintiffs' attempt to extrapolate fictitious "prices" by utilizing a cost adjustment factor. The short answer is that the statute does not authorize such adjustment of prices.

*British Steel Corp. v. United States,* 8 CIT 86, 95, 593 F.Supp. 405, 412 (1984). Furthermore, with regard to freight absorption costs, the information obtained by the ITC was specifically designed to eliminate the differences in transportation costs. The instructions to the pricing section of the questionnaries utilized by the ITC explicitly provided that "[p]rices must represent arm's length transactions, should be net of all discounts, allowances, rebates, and other deductions, should include the value of any premium to your firm, and *should exclude the cost of freight to your customers.*" List No. 2 of the Administrative Record, Conf.Doc. 37.26 at 18, *Copperweld Corp. v. United States,* Court No. 86–03–00338 [Conf.Doc.].

### III. *Vice Chairman Liebler's Five Factor Analysis*

Plaintiffs contend that Vice Chairman Liebler substituted five factors for those which are enumerated at § 1677(7). This issue involves footnote 20 of the plurality opinion which provides as follows:

Vice Chairman Liebler finds five factors to be particularly helpful on the issue of causation. An affirmative vote is more likely when the following conditions are present: (1) a large and increasing market share; (2) a high margin of dumping or subsidization; (3) homogeneous products; (4) declining domestic prices; and (5) barriers to entry. *See* Certain Red Rasberries from Canada, Inv. No. 731–TA–196 (Final), USITC Pub. 1680 at 11–19 (1985) (Additional Views of Vice Chairman Liebeler). Four of these factors are discussed directly in the body of this opinion. She also notes that foreign supply elasticity is high as evidenced by Japan's substantial imports to the U.S. market. Given Japan's presence, it would not be rational for Canada to price discriminate and attempt to injure the U.S. industry.

*Rectangular Pipes and Tubes from Canada (Final), supra,* at 9 n. 20.

■ Looking only at the language of this footnote, the Court finds little support for the plaintiffs' argument that Vice Chairman Liebeler substituted five factors for those contained in § 1677(7). The Vice Chairman stated that five factors are *"particularly helpful"* on the issue of causation. It cannot be fairly implied that Commissioner Liebler substituted these five factors for those which are enumerated at § 1677(7). It is rational to conclude that this footnote is incidental to the views elucidated in the plurality opinion.

The Court's conclusion finds additional support from consideration of this footnote in the context of the entire plurality opinion. In finding no material injury to the domestic industry by reason of the subject imports, the plurality (in which Vice Chairman Liebler was a member) clearly recognized the statutory requirement to consider "among other factors, the volume of imports, the effect of the LTFV imports on prices in the United States for the like product, and the impact of such imports on the relevant domestic industry." *Rectangular Pipes and Tubes from Canada (Final), supra,* at 8–9 (footnote omitted).[13]

### IV. Condition of the Domestic Industry

In finding there was no material injury to the domestic industry, Commissioners Stern, Liebeler, and Brunsdale based their determination primarily on the lack of causal connection between the imports from Canada and the condition of the domestic industry. *Id.* at 3. They found that the condition of the domestic industry improved significantly during the course of the investigation but based their negative determination primarily on an analysis of other causal factors. *Id.* at 8.

In discussing the condition of the domestic industry, Commissioners Stern, Liebeler, and Brunsdale noted that domestic production of H–WR rose from 289,502 short tons in 1982 to 444,698 in 1984 and that domestic production for the interim period of January–September, 1985 was 8% higher than it was during the same period in 1984. *Id.* at 5–6. The Commissioners also noted that U.S. producers' domestic shipments increased from 300,469 tons in 1982 to 438,-

151 tons in 1984. For the interim period of January–September, 1985, Commissioners Stern, Liebeler, and Brunsdale found that shipments were 10% greater than shipments in the corresponding period of 1984. With regard to domestic productive capacity utilization, the Commissioners cited an increase of 26.3% in 1982 to 40.6% during the interim period of 1985. *Id.* at 6.

Commissioners Stern, Liebeler, and Brunsdale also noted that the number of production and related workers for H–WR increased throughout the period of investigation. They observed that wages paid, total compensation, and labor productivity increased. *Id.* at 7.

These Commissioners concluded that the financial performance of the domestic industry improved irregularly throughout the period of investigation. They noted that the industry posted net operating losses of $11.6 million in 1982 but posted net operating income of $2 million during the interim period of 1985. *Id.*

With regard to productive capacity and capital expenditures, Commissioners Stern, Liebeler, and Brunsdale made the following observations:

Domestic producers increased their installed productive capacity by more than 8% from 1982–84. During January–September 1985, domestic productive capacity decreased approximately 1 percent compared to the corresponding period of 1984.

. . . .

The industry has increased its productive capacity over the period of investigation in spite of low capacity utilization.

---

**13.** Referring to Vice Chairman Liebeler's additional views in the *Red Rasberries* determination cited in footnote 20, plaintiffs contend that consideration of the five factors is unlawful since the factors derive from the erroneous assumption that only predatory pricing is actionable under the antidumping laws. According to the plaintiffs, Liebler treats these factors as "proxies" for predatory pricing information. Plaintiffs also argue that defendant's stated explanation for utilizing these factors is a post-hoc rationalization since it conflicts with the rationale given in *Red Rasberries.* Upon thorough consideration of this argument and in view of Vice Chairman Liebeler's apparent intention,

the Court finds reference to *Red Rasberries* inappropriate in the instant case. Although it is generally appropriate to refer to the sources cited in support of a particular proposition, the language of the footnote indicates that Vice Chairman Liebeler was not relying upon the rationale given in *Red Rasberries.* Vice Chairman Liebler explicitly stated that "[f]our of these factors are discussed directly in the body of this [plurality] opinion." *Rectangular Pipes and Tubes from Canada (Final), supra,* at 9, n. 20. Thus, it is appropriate to refer not to the rationale given in *Red Rasberries* but rather the rationale given in the plurality opinion.

It has invested significant sums in capital expenditures, especially machinery and equipment used to produce H–WR. Thus, the domestic industry does not consider current levels of capacity utilization a bar to modernization and is willing to incur costs to buy new machinery, presumably because the producers expect to be able to use that new machinery profitably to lower costs and expand output. *Rectangular Pipes and Tubes from Canada (Final), supra,* at 6–8 (footnotes omitted).

Plaintiffs do not dispute that there is substantial evidence in the record to support the finding that production, shipments, capacity utilization, and profits increased between 1982 and the first nine months of 1985. Plaintiffs' Reply Brief at 30, *Copperweld Corp. v. United States,* Court No. 86–03–00338. Instead plaintiffs argue that the evidence in the record does not support the conclusion that domestic producers increased their installed productive capacity by more than 8% from 1982–84. Plaintiffs' apparent concern is that not all of the firms in the industry increased their productive capacity. In the plaintiffs' view, the ITC should make a company-by-company analysis of the condition of the industry.

■ Section 1673d(b)(1) requires that the ITC make and publish a final determination of whether a "domestic industry" is materially injured by reason of the subject imports. The domestic industry is further defined as "the domestic producers *as a whole* of the like product...." 19 U.S.C.A. § 1677(4)(A) (1980 & Supp.1986). This language makes manifestly clear that Congress intended the ITC determine whether or not the domestic industry (as a whole) has experienced material injury due to the imports. This language defies the suggestion that the ITC must make a disaggregated analysis of material injury. Furthermore, it appears that if Congress had in-

tended that the ITC analyze injury on a disaggregated basis, Congress would have made this intention explicit, as it did for example in regard to regional industries.[14]

Plaintiffs also contend there is insufficient evidence in the record to support the finding that the domestic industry has invested significant sums in capital expenditures. According to the plaintiffs, capital expenditures actually declined precipitously during the period of investigation. Plaintiffs dispute the suggestion that "producers expect to be able to use [the] new machinery profitably to lower costs and expand output."

After careful review of the data gathered by Commission investigators, the Court is unable to discern either a positive or a negative trend in capital expenditures including those for machinery and equipment. After an increase in 1983, total capital expenditures declined precipitously in 1984. And while expenditures during the interim period of 1985 were greater than those during the same period in 1984, these expenditures were nowhere near 1982–83 levels.

■ Nevertheless, the Court finds there is sufficient evidence in the record to support the finding that the domestic industry invested "significant" sums in capital expenditures and that the condition of the domestic industry improved during the course of the investigation. The plurality did not determine that capital expenditures *increased* during the period of investigation. They merely stated that capital expenditures were *significant.* As previously stated, there was undisputed evidence in the record that production, shipments, capacity utilization, wages paid, and labor productivity increased during the relevant period. Thus, even though the evidence in the record regarding capital expenditures is not determinative of the condition of the

---

**14.** With regard to regional industries, a disaggregated analysis is specifically authorized: material injury ... may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a like product constitutes a major proportion of the total domestic pro-

duction of that product, is not injured ... if the producers of all, or almost all, of the production within that market are being materially injured....

19 U.S.C.A. § 1677(4)(C)(1980 & Supp.1986). *See Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556 (Fed.Cir.1984).

domestic industry, there is ample evidence in the record, owing to other factors, that the condition of the domestic industry improved over the course of the investigation.

## V. Import Volume

In their causation analysis, a majority of the Commissioners found that the absolute volume of imports increased during the period of investigation. *Rectangular Pipes and Tubes from Canada (Final), supra,* at 10, 20–21. The Commissioners focused their analysis on the Canadians' relative share of the domestic market. Commissioners Lodwick and Rohr observed that "[t]he Canadian share of total imports has decreased. More importantly, however, Canadian imports, relative to the dynamic conditions of the industry, have been stable." *Id.* at 21. Commissioners Stern, Liebeler, and Brunsdale offered their own view of the situation:

Imports from Canada, as a share of domestic consumption, have declined during the period of this investigation. Thus, although Canadian imports have increased absolutely, they have not taken market share from domestic producers. Domestic consumption has increased rapidly from 445,085 tons in 1982 to 701,555 tons in 1984 and from 539,506 tons during January–September 1984 to 578,354 tons during January–September 1985. Given the sharp increases in domestic consumption, *the absolute volume of imports is not a useful indicator of causation.*

*Id.* at 9–10 (footnotes omitted).

Plaintiffs contend the conclusion that "the absolute volume of imports is not a useful indicator of causation," is not in accordance with law. According to the plaintiffs, such a conclusion conflicts with the statutory requirement that the absolute volume of imports be considered.

Section 1677(7)(C)(i) specifies that in evaluating the volume of imports, the ITC "shall consider whether the volume of imports of the merchandise, or any increase in that volume, *either in absolute terms or relative to production or consumption* in the United States, is significant."

■ This language when read in conjunction with the legislative history indicates that disjunctive language was chosen to signify congressional intent that the agency be given broad discretion to analyze import volume in the context of the industry concerned:

It is expected that in its investigation the Commission will continue to focus on the conditions of trade, competition, and development regarding the industry concerned. For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant.

S.Rep. No. 249, 96th Cong., 1st Sess. at 88, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 474.

In directing their attention to the relative share of the domestic market held by the Canadians, the majority of the Commissioners fulfilled their statutory duty to analyze the volume of imports in either an absolute *or* a relative sense depending upon what is appropriate under the circumstances. The majority's preference for relative import data, given the sharp increase in domestic consumption, was not only authorized but was reasonable.

Urging that the industry was in a state of injury during the entire investigation, plaintiffs object to the ITC's focus on declining import penetration levels. In the plaintiffs' view, "the commissioners did not seem to ask themselves whether a 12.8% market share might be an injurious level in 1983, and if so, why a 12.7% market share is not also injurious in 1985." Brief in Support of Motion for Judgment on the Agency Record at 72, *Copperweld Corp. v. United States,* Court No. 86–03–00338.

The ITC's focus on penetration levels, however, finds ample support in the language of the statute which authorizes consideration of whether the volume or any *increase* in that volume, either in absolute or relative terms is significant. This view is consistent with the ITC's authority to consider import volume with a focus on the "conditions of trade, competition, and de-

velopment regarding the industry concerned." S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 474. A focus upon declining import penetration levels is also consistent with the ITC's discretion to consider import penetration one factor among the many that affect the domestic industry. *See SCM Corp. v. United States,* 4 CIT 7, 13, 544 F.Supp. 194, 199 (1982).

## VI. Lost Sales, Price Suppression, and Depression

In the preliminary determination, the Commissioners found that there was a reasonable indication that an industry in the United States was materially injured by reason of H–WR imports from Canada. *Rectangular Pipes and Tubes from Canada (Preliminary), supra,* at 3. The Commissioners concluded that the price of the Canadian product may be affecting the price of the domestic product. *Id.* at 7. This conclusion was based in part on the confirmation of "numerous lost sales to Canadian imports, many of which were lost on the basis of price." *Id.*

In the final determination, Commissioners Stern, Liebeler, and Brunsdale arrived at a different conclusion with regard to the evidence of lost sales:

> The Commission received 26 specific lost sales allegations from five U.S. producers, involving 21 purchasers. Although the Commission confirmed that price was one of several purchasing considerations by domestic purchasers, a significant number of purchasers emphasized reliability, delivery time, availability, and "service." Many purchasers stated that they consider the domestic producers to be the price leaders in the market.

*Rectangular Pipes and Tubes from Canada (Final), supra,* at 12–13 (footnotes omitted).

Referring to the staff reports of the preliminary and final investigations, plaintiffs urge that the discussions concerning lost sales are virtually identical in both reports except for an additional lost sale allegation in the final investigation. Plaintiffs question the propriety of the different conclusion reached by the plurality in the final determination.

■ In a preliminary determination, the ITC must ascertain whether there is a "reasonable indication" that a U.S. industry is materially injured by reason of the subject imports. 19 U.S.C. § 1673b(a) (1982). This standard is understood to impose a very low threshold for an affirmative determination. As the United States Court of Appeals for the Federal Circuit has stated, the ITC shall find no reasonable indication of material injury only when "(1) there is clear and convincing evidence of the absence of such reasonable indication; and (2) the record shows it extremely unlikely that evidence of a 'reasonable indication' would be developed in a final investigation." *American Lamb Co. v. United States,* 785 F.2d 994, 999 (Fed.Cir.1986) (citations omitted).

By contrast, in a final investigation, the ITC is directed to determine whether an industry in the U.S. *is* materially injured by reason of the imports of merchandise at less than fair value. 19 U.S.C. § 1673d(b)(1)(A)(i) (1982). This standard is more exacting than that which is applicable in a preliminary determination. In a final investigation, the ITC must determine whether or not material injury actually exists; a "reasonable indication" of injury is never enough.

■ Thus, even though the staff reports in the preliminary and final investigation contain virtually identical discussions of the lost sales allegations, the plurality in the final investigation was properly discharging its duty to apply an evidentiary threshold that was higher than the standard applicable in the preliminary determination. In the final investigation, the ITC also had more extensive information available to it as evidenced by, for example, the purchasers' questionnaires. Finally, this Court has no authority to interfere with the plurality's discretion to make a reasonable interpretation of the evidence collected in the final investigation. *Maine Potato Council,* 9 CIT at 300, 613 F.Supp. at 1244.

As previously stated, the ITC received 26 specific lost sales allegations[15] from five U.S. producers involving 21 purchasers. Some of these sales allegations were confirmed. The ITC confirmed that a significant number of these sales were lost for reasons other than price, i.e. reliability, delivery time, availability, "service." With regard to the lost revenue allegations,[16] the ITC received 32 allegations from three U.S. producers involving 19 purchasers. Four of these allegations were denied. Purchasers were unable to either confirm or deny the other allegations. *See Rectangular Pipes and Tubes from Canada (Final), supra,* at 12–13.

Plaintiffs criticize the plurality's use of the data involving lost sales, lost revenues, price suppression, and price depression. As a first argument, plaintiffs contend that a sale lost due to the provision by the foreign producer of a service that costs money to provide should still be considered a true lost sale. Plaintiffs further argue that the data is obtained from parties interested in the outcome of the determination; and therefore, the ITC should not draw adverse inferences from this data against the domestic industry.

 Although it would certainly be appropriate for the agency to give consideration to plaintiffs' concerns, the plurality considered the data of lost sales, lost revenues, price suppression, and price depression among the many factors bearing on

the question of the effect of the price and impact of the imports on the domestic industry. With regard to lost sales, there is no statutory provision which requires the ITC to perform any particular type of analysis. *Maine Potato Council,* 9 CIT at 302, 613 F.Supp. at 1245. Furthermore, the plurality treated the lost sales data with caution: "We note that the presence or absence of confirmed lost sales is rarely determinative or persuasive on the question of a causal link between LTFV imports and material injury to the domestic industry." *Rectangular Pipes and Tubes from Canada (Final), supra,* at 12 n. 28.

The record also contains substantial evidence gauged from a wealth of sources that the domestic H–WR market was highly competitive.[17] A clear majority of the Commissioners were unable to discern an overall pattern of price underselling by the Canadian imports. They found that purchasing decisions were influenced by factors other than price and that domestic producers were more often the price leaders in the market. *Id.* at 10–13, 23.

## VII. Capacity Utilization and Profitability

In the final determination, Commissioners Stern, Liebeler, and Brunsdale made the following comments in regard to the low levels of capacity utilization and profitability experienced by the domestic industry:

**15.** Lost sales allegations refer to the situation in which the domestic industry is unable to make a sale because of the presence of lower priced imports.

**16.** Lost revenue allegations, by contrast, refer to the situation in which the domestic industry lowers its price to make a sale in the face of competition with the imported product.

**17.** In discussing price comparisons, the ITC staff cited the following as evidence of the highly competitive nature of the domestic market:

The highly competitive nature of the domestic market for these products, attested to by numerous customers as well as producers, is reflected in the mixed pattern of prices of U.S. producers and Canadian importers revealed in the information gathered both from the producers and from purchasers. Some of the

time one source has the lowest price, some of the time the other does, but on average their prices are quite similar.

. . . .

In connection with lost sales allegations and purchaser questionnaires, at least 10 customers of the products under investigation were contacted by telephone by the Commission staff and asked to describe the nature of the market and the pricing practices of the U.S. producers and Canadian importers. In these discussions, the consensus emerged that the market is highly competitive and would be so even in the absence of LTFV imports from Canada. The purchasers more often characterized the U.S. producers as more aggressive price cutters than the Canadians, viewing the prices of Canadian imports as more likely to follow than to lead.

*Rectangular Pipes and Tubes from Canada (Final), supra,* at A–31.

Recent increases in domestic production and shipments have not led to significant increases in profitability. Although operating income as a percent of sales improved markedly after 1982, there has been little change in this profit measure since 1983. These results are explained by the low levels of capacity utilization discussed above, which suggest that substantial expansion in the demand for domestic output would not have much effect on domestic prices in the short run.[27] Thus, even assuming that the total volume of Canadian imports were to decline substantially and assuming that the entire decline were captured by the domestic producers, domestic capacity utilization would not be raised sufficiently to have a significant effect on profit margins in the industry.

[27] Based on the information obtained in this investigation we believe that the domestic H-WR industry is competitive, capital-intensive and that the short-run supply curve is highly elastic in the relevant range. *See* testimony of Dr. Leone, Transcript of the hearing (TR.) at 71.

*Rectangular Pipes and Tubes From Canada (Final), supra,* at 11–12 (footnote omitted). Citing an improvement in profits from 1982 to 1983, plaintiffs disagree with the plurality's conclusion that profitability would not be effected if the Canadian market share were captured by the domestic industry. Plaintiffs assert that improvements in capacity utilization can and have had a positive effect on profits so that a substantial capture of the Canadian market share by domestic producers is likely to be quite beneficial.

As previously stated, the evidence in the record established that the domestic industry is highly competitive and operating at low levels of capacity utilization. A majority of the Commissioners, after examining a substantial amount of pricing data, characterized the domestic industry as having a mixed pattern of underselling and overselling without clear evidence of price leadership.

To supplement the evidence in the record, Titan presented expert testimony of Robert A. Leone.[18] Dr. Leone examined the domestic H-WR industry and the role of the Canadian imports. Dr. Leone analyzed the profitability data. He compared price and cost data and price and output levels. He concluded that the domestic industry was operating in the highly elastic [19] portion (relatively horizontal portion) of the supply curve. Dr. Leone observed that as long as the domestic industry is operating at a low level of capacity utilization, in theory, two phenomena will occur: (1) little upward price pressure with volume increases; and (2) low profits overall and little variation in profit with volume. Pub.Doc. 63 at 36.

The Court finds the evidence in the record which includes Dr. Leone's economic analysis substantiates the findings of the plurality. Between 1983 and the first nine months of 1985, capacity utilization increased from 32.2% to 40.6%. *Rectangular Pipes and Tubes from Canada (Final), supra,* at A-8. At the same time, there was little change in profits. *Id.* at A-14. The mere fact that operating income as a percent of sales improved between 1982 and 1983 does not detract from the conclusion that a substantial increase in demand and capacity utilization will not have much effect on domestic prices and profitability in the short run.

Taking issue with the plurality's reliance upon Dr. Leone's economic analysis, plaintiffs contend that the analysis curiously omits reference to demand for H-WR. Whether or not demand was an integral part of the analysis, the Court finds the theoretical supply curve constructed by Dr. Leone was borne out in practice. Empirical evidence established that prices, once

18. Dr. Leone holds a Ph.D. in Economics from Yale University. He assisted the ITC in preparing a complete economic analysis of the impact on the domestic industry of steel products from Canada for a Section 201 investigation. *See Carbon and Certain Alloy Steel Products,* Inv. No. 201–TA–51 (1984)

19. Elasticity of supply refers to the relationship between a change in price and a change in the willingness of competitors to supply a given product. Pub. Doc. 63 at 30.

adjusted for cost changes, did not increase after 1982 despite substantial increases in volume. Pub.Doc. 63 at 36. This evidence reflected the actual interplay of supply and demand for H–WR. Furthermore, the staff report noted that as demand, production, and capacity utilization increased, profits remained negligible. *Rectangular Pipes and Tubes From Canada (Final), supra,* at A–14.

Plaintiffs also challenge Dr. Leones' assertion that when an industry is operating at low levels of capacity utilization, even a modest increase in price can induce large increases in supply. Plaintiffs contend this assertion suggests that domestic producers are holding back on supply because prices are low. In the plaintiffs' view, if prices increase without an increase in demand, then the industry will not suddenly supply a greater quantity of H–WR. Although supply of a given product is in part dependent upon the demand for the product, it is evident that plaintiffs mischaracterize Dr. Leone's assertion. His assertion was made in the context of and to elaborate upon a discussion regarding supply elasticity. It was based entirely in theory. Dr. Leone may have assumed the supply of the product would be met with a corresponding increase in demand for the product. *See* Pub.Doc. 63 at 30.

Plaintiffs criticize Dr. Leones' conclusion that since coil costs fell as did prices, prices are actually stable and the Canadian's did not intensify price pressures. Citing the testimony of Roy Herman of plaintiff, UNR–Leavitt, plaintiffs assert that prices did not follow costs.

Dr. Leone began his analysis with the observation that the domestic H–WR market is highly competitive, an observation which finds overwhelming support in the record. *See supra* note 17. He noted that in a highly competitive market, cost changes would be expected to translate quickly into price changes. Pub.Doc. 63 at 33. From a qualitative perspective, Dr. Leone asserted that an increase in the number of producers resulting from the Canadian market presence would intensify the degree of competition in the industry. *Id.*

at 29. He noted that an increase in the number of suppliers, in theory, would add to the elasticity of supply. Dr. Leone observed that the more elastic an industry's supply curve, the more intense the downward competitive pressure on prices. *Id.* at 30. Finally, Dr. Leone noted that when a highly competitive industry is operating in the relatively flat (highly elastic) portion of its supply curve, certain behavior will be observed. According to Dr. Leone, this behavior includes prices being closely tied to short-run costs, intense pressures on productivity and wage restraints, low total profits, and stable or decreasing employment. He concluded that if this behavior is observed and it would be expected to occur in the absence of Canadian competition, it follows that Canadian imports have neither created nor intensified the competitive conditions in the market. *Id.* at 35.

■ The evidence in the record establishes that labor productivity increased and unit labor costs declined during the period of investigation. *Rectangular Pipes and Tubes From Canada (Final), supra,* at Table 6. The evidence also indicated the H–WR industry experienced low total profits. The actual data gathered by the ITC therefore demonstrates the existence of the behavior Dr. Leone expected would occur. The mere fact that plaintiffs' witness alleged that costs were increasing does not, in and of itself, establish that Dr. Leone's conclusion that Canadian market presence intensified the price pressures in the domestic market is flawed.

Plaintiffs criticize Dr. Leone's response to questions regarding new entrants. Dr. Leone testified that new entrants would take the same price that is determined by competitive conditions in the market. In the plaintiffs view, the ITC has been through enough cases to know that new entrants must use price to gain entry in the the market.

■ Whether or not the ITC "knows" such a thing is irrelevant since the evidence shows that purchasers of Canadian imports valued non price factors (e.g. delivery, product availability, quality, and service). *Id.* at A–31. In view of this evidence,

plaintiffs' unsupported allegation that new entrants must use price to gain entry into the market is totally unfounded. The plaintiffs in fact recognized this likelihood when they asserted that "buyers have no incentive to buy from someone new (*assuming service and quality is (sic) similar*)...." Brief in Support of Motion for Judgment on the Agency Record, *supra,* at 83 (emphasis added).

Plaintiffs further criticize Dr. Leone's assertion that if the U.S. industry captured the Canadian market share, prices would remain unchanged and that therefore Canadian imports have not caused injury. Plaintiffs contend that U.S. producers would benefit enormously from the extra volume even without price increases. In the plaintiffs' view, Dr. Leone's analysis might argue against a finding of *serious* injury, but does not demonstrate the absence of the low level of injury necessary under the antidumping laws. This standard, according to the plaintiffs, requires material injury caused to a significant degree by the unfairly traded imports.

■■■ The Court has previously upheld the plurality's conclusion that if the U.S. industry captured the total volume of Canadian imports, capacity utilization would not be raised sufficiently to have a significant effect on profit margins. This conclusion was made in support of the plurality's finding and supported by Dr. Leone's economic analysis that the domestic industry did not incur material injury by reason of the LTFV imports of H–WR from Canada. It was made against a finding that the H–WR industry is highly competitive. In view of the entire record compiled by the ITC, the Court will not accept the plaintiffs' unsupported allegation that plaintiffs would in fact benefit from a volume increase without a corresponding price increase. It bears repeating that an ITC determination of material injury or threat of material injury is presumed correct. The burden of proving otherwise rests with the party challenging it. 28 U.S.C. § 2639(a)(1).

## VIII. Threat of Material Injury

In the final determination, the plurality, with which Commissioners Lodwick and Rohr concurred, concluded that there is no threat of material injury by reason of H–WR imports from Canada:

There is no evidence of record in this investigation that the Canadian producers intend to increase their share of the U.S. market. In fact, their 1986 marketing plans, which include only modest increases in shipments to the United States, will lead to a decreased relative presence in the U.S. market.[37] There is no information that any Canadian mill intends to divert production to the United States.

We note that a new firm, Transamerican, has entered the domestic market for H–WR. The firm intends to import and sell Canadian H–WR. This does not alter our conclusion that there is no threat of injury. This new firm can only sell the product that is made available to it by Canadian mills, has no established track record in the United States, and will have to compete in an already crowded market. Thus, it is highly unlikely that the firm will have any significant impact on the market in the foreseeable future.

---

[37] There is no information of record that the increases in domestic consumption will abate during 1986.

*Rectangular Pipes and Tubes from Canada (Final), supra,* at 16.

Plaintiffs contend the statement in footnote 37 that "[t]here is no information of record that the increases in domestic consumption will abate during 1986," is absolutely wrong. In this regard, plaintiffs assert that there is no information of record that domestic consumption will increase in 1986, while there is information that such consumption will not increase. Plaintiffs allude to the statement of William Nostrand, President of the plaintiff company, Welded Tube Company of America that "industry forecasts show that these market segments for our products will remain flat for the next year or two." Pub.Doc. 72 at 15. In response, the defendant contends that there was good reason to doubt the plaintiffs' forecast since

plaintiffs' earlier forecasts had proven to be inaccurate. The defendant points out that during the preliminary investigation in early 1985, the plaintiffs erroneously predicted that the 1984 recovery would be short-lived and that the market would deteriorate in 1985.

■ A finding of threat of material injury must be based on evidence that the threat of injury is "real and that actual injury is imminent." Such a determination may not be based on mere supposition or conjecture. 19 U.S.C. § 1677(7)(F)(ii). On the other hand, an examination of threat of injury is necessarily predictive since it must assess the future course of imports and their effect upon the domestic industry. Since there was evidence that domestic production increased more than 71% from 1982 to 1985, *see Rectangular Pipes and Tubes from Canada (Final), supra,* at 5–6, and since plaintiffs' earlier forecast had proven to be inaccurate, the Court finds reasonable the defendant's reliance upon its own forecast that the domestic market would continue to grow in 1986.

Plaintiffs also criticize the plurality's use of the Canadian producers' forecast of home market sales. In the plaintiffs' view, this information is speculative and should not be probative evidence of a lack of threat. It is the plaintiffs' own argument, however, that is speculative. The plurality found that "the Canadian firms from which we have information have indicated an intention to significantly increase their domestic sales." *Rectangular Pipes and Tubes from Canada (Final), supra,* at 17. There was also evidence that home market sales increased at an annual rate of 24% from 1982 to 1985. In view of this evidence, the defendant's prediction that this trend would continue was reasonable.

Plaintiffs criticize the plurality's statements that "[t]here is no information that any Canadian mill intends to divert production to the United States," and that the

producers' 1986 marketing plans include only "modest" increases in shipments to the United States. Referring exclusively to the data on capacity and shipments submitted by one Canadian manufacturer, and to the presence of Transamerican as an importer of Canadian H–WR, plaintiffs contend that the ITC should have found a threat of significantly increased imports from Canada.

■ The evidence in the record, however, establishes that from 1982 to 1985, as production of H–WR in Canada rose, home market sales rose at an even faster pace. Furthermore, as the plurality noted: "H–WR imports from Canada have been present in the U.S. market for some time and they have maintained a stable market presence. Their actual share of apparent domestic consumption has declined irregularly over the course of the investigation...." *Rectangular Pipes and Tubes from Canada (Final), supra,* at 15. The staff also reported that while capacity data was not available for the six firms, three of the firms reported an average annual increase in production capacity of only 4% from 1982 to 1985. *Id.* at A–18. Without expressing any opinion as to the relationship between Transamerican and a Canadian manufacturer,[20] the Court observes that although this Canadian manufacturer planned to increase its exports, this same manufacturer planned to significantly expand its home market sales. At least two other Canadian firms planned to decrease their exports. It is evident that any adverse impact of these imports would be mitigated by the fact that the domestic market would continue to grow in 1986. In addition, it appears there has been no shift in emphasis in Canadian production towards the U.S. market. From the evidence gathered by the Commission, the Court finds the plurality's conclusions regarding Canadian capacity and shipments are sup-

---

**20.** Plaintiffs suggest that the presence of Transamerican through special pricing deals offered by it, demonstrates the existence of a significant threat of material injury to the domestic industry. This assertion seems conjectural at best. Furthermore, Transamerican has no established track record. It must compete in an already crowded and competitive market. As the ITC correctly reasoned, the presence of Transamerican, does not establish that "the threat of injury is real and that actual injury is imminent." § 1677(7)(F)(ii).

ported by substantial evidence in the record and are otherwise in accordance with law.

With regard to capacity, plaintiffs also assert that the ITC did not take into account or rely upon revised figures on capacity in Conf. Doc. 37.D (Dennis Rapkin's copy of January 16, 1986). Plaintiffs assert that the ITC should have considered revised data for three firms providing complete data.

 The total amounts written on the worksheets of Conf. Doc. 37.D were the figures considered and relied upon by the ITC. *Compare* Conf.Doc. 19 at A–24 *with* Conf. Doc. 32 at A–23. Regardless of what the evidence for the three firms providing complete data shows, the ITC analyzed data for five firms providing complete data. Plaintiffs' attempt to require the ITC to draw a favorable conclusion from selected capacity data fails as a matter of law. The ITC has discretion to make a reasonable interpretation of the facts. *See, e.g., Sprague Electric Co. v. United States*, 2 CIT 302, 310, 529 F.Supp. 676, 683 (1981).

### CONCLUSION

For the reasons given above, the Court holds that the ITC's determination in *Rectangular Pipes and Tubes from Canada (Final), supra,* is supported by substantial evidence in the record and is otherwise in accordance with law. Accordingly, the plaintiffs' motion for judgment on the agency record is denied.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED, and DECREED that the plaintiffs' motion for judgment on the agency record is denied; and it is further

ORDERED, ADJUDGED, and DECREED that the final negative injury determination of the International Trade Commission in *Heavy–Walled Rectangular Welded Carbon Steel Pipes and Tubes from Canada,* Inv. No. 731–TA–254 (Final), USITC Pub. No. 1808 (February, 1986) is sustained.