**METALLVERKEN NEDERLAND B.V.,**
**and Outokumpu Metallverken,**
**Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**American Brass, et al.,**
**Defendants–Intervenors.**

**Court No. 88–09–00711.**

United States Court of
International Trade.

Dec. 18, 1989.

Winthrop Stimson, Putnam & Roberts, New York City, Thomas V. Vakerics, Kenneth Berlin, Mark A. Monborne, James A. Meade, New York City, and Joni A. Laura, Arent, Fox, Kintner, Plotkin & Kahn, Stephen L. Gibson and Callie Georgeann Pappas, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., M. Martha Ries, Lyn M. Schlitt, Gen. Counsel, Judith M. Czako, Acting Asst. Gen. Counsel, U.S. I.T.C., Calvin H. Cobb, III, Washington, D.C., for defendant.

Collier, Shannon & Scott, David A. Hartquist, Jeffrey S. Beckington, and Kathleen Weaver Cannon, Washington, D.C., for defendants-intervenors.

DiCARLO, Judge:

Metallverken Nederland, a Dutch brass producer, and Outokumpu Metallverken, an importer of Japanese brass, move pursuant to Rule 56.1 of the Rules of this Court to challenge the final affirmative determination of the United States International Trade Commission that a domestic industry is being materially injured or threatened with material injury by reason of imports of certain brass sheet and strip from Japan and The Netherlands. *Certain Brass Sheet and Strip from Japan and The Netherlands,* Inv. Nos. 731–TA–379 and 380 (Final), USITC Pub. 2099 (July, 1988). The Court has jurisdiction under 28 U.S.C. § 1581(c) (1982).

Plaintiffs assert that in providing for an affirmative determination in the event of an evenly-divided vote of the Commission, 19 U.S.C. § 1677(11) (1988) is unconstitutional, or, in the alternative, that the Commission misapplied the statute because the Commission was not evenly divided. Plaintiffs also claim that the affirmative material injury determination of Commissioners Eckes and Lodwick and Commissioner Rohr's affirmative threat of material injury determination are unsupported by substantial evidence on the record and are otherwise not in accordance with law.

The Court holds that the tie-vote provision in 19 U.S.C. § 1677(11) is constitutional, and was properly applied by the Commission. The Court also finds that the material-injury determination of Commissioners Eckes and Lodwick is supported by substantial evidence on the record and is otherwise in accordance with law. The Court finds Commissioner Rohr's threat of material injury determination must be reconsidered because there is substantial doubt as to whether the determination was flawed by a mistake of fact. Therefore, the Court remands.

## DISCUSSION

### I. THE TIE–VOTE PROVISION

Two of the six commissioners cast affirmative votes based upon a finding of material injury. Of the four remaining commissioners, one cast an affirmative vote based upon a finding of threat of material injury. Since three of the six commissioners found either material injury or threat of material injury, the Commission reached an affirmative injury determination under the tie-vote provision of 19 U.S.C. § 1677(11).

The tie-vote provision states:

If the Commissioners voting on a determination by the Commission are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination. For the purpose of applying this paragraph when the issue before the Commission is to determine whether there is—

(A) material injury to an industry in the United States,

(B) threat of material injury to such an industry, or

(C) material retardation of the establishment of an industry in the United States,

by reason of imports of the merchandise, an affirmative vote on any of the issues shall be treated as a vote that the determination should be affirmative.

19 U.S.C. § 1677(11) (1988).

### A. Constitutionality

Plaintiffs raise two arguments challenging the constitutionality of this provision: (1) by permitting the Commission to reach an affirmative injury determination in the event of an evenly-divided Commission vote, the statute violates the plaintiffs' right to due process of law, and (2) should the tie-vote procedure be constitutional, adding together the affirmative votes on the three separate injury issues to ascertain whether a determination is affirmative or negative constitutes an unconstitutional deprivation of due process.

In *Border Brokerage Co. v. United States,* 68 CCPA 32, 39–41, 646 F.2d 539, 545–47 (1981), the Court of Customs and Patent Appeals upheld the constitutionality of the Commission's tie-vote procedure under section 201(a) of the Antidumping Act of 1921, Pub.L. No. 85–630, 72 Stat. 583

(1958), the predecessor provision to 19 U.S.C. § 1677(11). Plaintiffs argue that *Border Brokerage* is not dispositive and that it was wrongly decided.

■ Our appellate court, the Federal Circuit, has held that the decisions of its predecessor, the Court of Customs and Patent Appeals, are binding upon it as precedent. *South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed.Cir.1982). This Court is, therefore, compelled to follow the holding of *Border Brokerage*, until that decision is overturned by the Federal Circuit sitting *en banc*. *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1573 (Fed.Cir.1984); *South Corp.*, 690 F.2d at 1370 n. 2. Accordingly, the Court holds that an affirmative determination in the event of an evenly-divided Commission vote is not an unconstitutional deprivation of due process.

Plaintiffs assert that the tie-vote provision under the present statute contains a material change from that in the statute considered in *Border Brokerage*, and, therefore, the holding in that case is distinguishable. Under section 201(a) of the Antidumping Act of 1921, a commissioner voted only once on the question of material injury. A commissioner could premise an affirmative vote on a finding of material injury, threat of material injury, or material retardation, but did not have to state upon which of these three injury issues his or her vote was based. In 19 U.S.C. § 1677(11), Congress added a requirement that the commissioners vote separately on material injury, threat of material injury, and material retardation. An affirmative vote on any one of these injury issues is then treated as an affirmative vote as to the final Commission determination. 19 U.S.C. § 1677(11) (1988). Plaintiffs claim this new provision is an

> aggregation of the minority votes cast in ... different affirmative determinations by [the] Commissioners and the transformation through legislative fiat of the majority negative votes into a tie vote and then into an affirmative present injury determination....

Plaintiffs' Brief in Support of Their Rule 56.1 Motion for Judgment on the Agency Record, 128–29. They argue that addition of this "aggregation feature" in the tie-vote provision under 19 U.S.C. § 1677(11) constitutes a deprivation of due process of law.

19 U.S.C. § 1677(11) was intended to "carry forward under the new law the analogous provision under the existing law." S.Rep. No. 249, 96th Cong., 1st Sess. 91, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 477. Under both the prior and present statutes, a commissioner casts an affirmative vote upon finding material injury, threat of material injury, or material retardation. Unlike the prior statute, the present statute merely requires the commissioners to vote upon the specific grounds of their determination. This additional requirement is an insufficient distinction to place 19 U.S.C. § 1677(11) outside the holding of *Border Brokerage*.

**B. Applicability**

■ Plaintiffs also submit that, because a majority of the participating commissioners made a negative finding on the separate issues of material injury and threat of material injury, the Commission's application of 19 U.S.C. § 1677(11) to reach an affirmative determination is not in accordance with law because the Commission was not "evenly divided." Plaintiffs claim that the tie-vote provision is triggered only when the Commission vote is evenly divided on any of the three separate injury issues.

At oral argument, plaintiffs agreed that according to their position, where two of the six commissioners find material injury, another two find threat of material injury, and the remaining two find material retardation, the Commission would be required to reach a negative determination because four commissioners cast negative votes on each injury issue. Yet, aside from their constitutional argument, plaintiffs concede that there would be a proper affirmative determination should three commissioners find only material retardation, which is the lowest level of injury recognizable under

the statute. Plaintiffs' argument is illogical and contrary to the plain language of the statute, which unambiguously states that "an affirmative vote on *any* of the issues shall be treated as a vote that the determination should be affirmative." 19 U.S.C. § 1677(11) (1988) (emphasis added). Thus, in ascertaining whether a Commission vote is evenly divided, all commissioners voting affirmatively on material injury, threat of material injury, *or* material retardation are deemed to have voted affirmatively as regards the Commission determination.

Here, three different commissioners found either material injury or threat of material injury. These votes constitute an equal division of the Commission, which, in accordance with 19 U.S.C. § 1677(11), the Commission properly held to be an affirmative determination of the Commission.

## II. MATERIAL INJURY DETERMINATION

Plaintiffs allege that the findings of Commissioners Eckes and Lodwick that the domestic industry was experiencing material injury by reason of imports of brass sheet and strip from The Netherlands and Japan are unsupported by substantial evidence on the record and are otherwise not in accordance with law because: (1) the findings of the dissenting commissioners are supported by substantial evidence and contradict the affirmative findings of Commissioners Eckes and Lodwick, (2) the record shows that the domestic industry was in good health economically, (3) there is no causal nexus between Dutch and Japanese imports and any injury to the domestic industry, and (4) Commissioners Eckes and Lodwick improperly shifted to the plaintiffs the burden of proof to show that imports were not a cause of material injury.

### A. Dissenting Commissioners' Negative Findings

Plaintiffs' argument that the negative findings on material injury contradict the affirmative findings of Commissioners Eckes and Lodwick is based on a misperception of the proper standard of review this Court must apply. In asking the Court to negate a commissioner's determination based upon the findings of the dissenting commissioners, plaintiffs are, in essence, asking the Court to reweigh the evidence. The function of this Court is not to reweigh the evidence, but rather is to ascertain whether the Commission's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988); *see Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984).

It is well settled that substantial evidence may exist in a record to support several inconsistent conclusions. *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Matsushita*, 750 F.2d at 933; *Negev Phosphates Ltd. v. United States*, 12 CIT ——, 699 F.Supp. 938, 942 (1988); *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, 704 F.Supp. 1075, 1088 (1988). As previously explained by this court, Congress' expectation that commissioners would file concurring and dissenting opinions stating their findings of fact and conclusions of law "would be pointless if the existence of differing views precluded courts from sustaining Commission determinations." *Citrosuco Paulista*, 12 CIT at ——, 704 F.Supp. at 1089; H.R.Rep. No. 317, 96th Cong., 1st Sess. 46 (1979).

### B. Material Injury

Plaintiffs allege three errors in the finding by Commissioners Eckes and Lodwick that the domestic industry was experiencing material injury: (1) the Commissioners improperly used 1984 data in assessing the financial condition of the domestic industry, (2) the findings were based upon nonprobative and insignificant data and ignored other more probative factors, and (3) the analysis of the domestic industry's operating losses should have excluded data from a firm that had incurred high start-up costs.

### 1. *Use of 1984 Data*

■ In its investigation, the Commission used data covering a four-year period beginning in 1984. Plaintiffs contend that it was improper for Commissioners Eckes and Lodwick to use 1984 as a benchmark against which to measure the domestic industry's performance because it was an abnormally good year for the domestic industry and gave a distorted picture of its economic condition. Plaintiffs' Rebuttal Brief in Response to Defendant's and Defendant–Intervenors' Briefs in Reply to Plaintiffs' Motion for Judgment on the Agency Record, 70.

The Commission has discretion to determine the appropriate periods of investigation. *Wieland Werke, AG v. United States*, 13 CIT ——, 718 F.Supp. 50, 55 (1989); *British Steel Corp. v. United States*, 8 CIT 86, 93, 593 F.Supp. 405, 411 (1984); *American Spring Wire Corp. v. United States*, 8 CIT 20, 26, 590 F.Supp. 1273, 1279 (1984), *aff'd sub nom. Armco Inc. v. United States*, 760 F.2d 249 (Fed. Cir.1985). The Commissioners have the discretion to determine the weight to be given factors they consider. *Copperweld Corp. v. United States*, 12 CIT ——, 682 F.Supp. 552, 562 (1988).

Commissioners Eckes and Lodwick rejected plaintiffs' argument:

> While it is true that there have been substantial improvements since our earlier final determinations, a review of the totality of the circumstances does not, in our view, lead to the conclusion urged by those respondents. Nothing in the record suggests that the structure of the domestic industry ... has changed in any significant fashion since 1984.

USITC Pub. 2099 at 12. They explained that the Commission included 1984 because "the 1984 data provide a more complete picture of the business cycle for this industry." *Id.* at 13. This rationale is consistent with the Commission's discretion to tailor its investigation according to the facts of a particular case, and the peculiarities of the industry under investigation.

The Court holds that the Commissioners did not abuse their discretion in their use of 1984 data.

### 2. *Relevant Economic Factors*

■ In finding material injury, Commissioners Eckes and Lodwick relied on data showing an increase in reported domestic operating losses, and declines in domestic capacity, employment, wages, net operating income as a percentage of net sales, and capital expenditures. USITC Pub. 2099 at 13–14. Plaintiffs do not contest the accuracy of these data. Rather, they argue that the factors relating to productive capacity and employment are "non-probative," the financial indicators are "insignificant," and the Commissioners ignored other factors demonstrating the good health of the domestic industry. Plaintiffs' Brief at 47–48.

In its analysis of the condition of the domestic industry, the Commission is directed to:

> evaluate all relevant economic factors which have a bearing on the state of the industry, including but not limited to—
>
> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>
> (II) factors affecting domestic prices, and
>
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C. § 1677(7)(C)(iii) (1988).

The Commission has broad discretion to ascertain which economic factors are relevant in an investigation, and the weight to be given those factors. *National Ass'n of Mirror Mfrs. v. United States*, 12 CIT ——, 696 F.Supp. 642, 645 (1988). As the court in *Mirror Mfrs.* stated:

> [n]either the presence nor the absence of any factor listed in the statute is decisive with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the Commission to decide.

*Id.; see also* 19 U.S.C. § 1677(7)(E)(ii) (1988); S. 249, 96th Cong., 1st Sess. 88,

*reprinted in* 1979 U.S.Code Cong. & Admin.News 474; H.R. 317, 96th Cong., 1st Sess. 46 (1979).

The Commissioners acknowledged that a number of economic factors relating to the domestic industry had improved. USITC Pub. 2099 at 11. Nevertheless, they weighed these factors against an increase they observed in reported operating losses, and declines in domestic capacity, employment, wages, net operating income as a percentage of net sales, and capital expenditures. *Id.* at 13–14. The Commissioners concluded that on balance, the economic factors indicated that the domestic industry was experiencing material injury. *Id.* at 14. The Court holds that this finding is supported by substantial evidence and is in accordance with law.

### 3. *Exclusion of Individual Firm Data*

With respect to the Commissioners' reliance on operating losses reported by the domestic industry, plaintiffs claim that the Commissioners should have excluded data from one firm whose operating losses were allegedly due to high start-up costs. The court has recently stated:

> Section 1673d(b)(1) required that the [Commission] make and publish a final determination of whether a "domestic industry" is materially injured by reason of the subject imports. The domestic industry is further defined as "the domestic producers *as a whole* of the like product...." 19 U.S.C. § 1677(4)(A).... This language makes manifestly clear that Congress intended the [Commission] determine whether or not the domestic industry (as a whole) has experienced material injury due to the imports. This language defies the suggestion that the [Commission] must make a disaggregated analysis of material injury.

*Sandvik AB v. United States*, 13 CIT ——, 721 F.Supp. 1322, 1330 (1989) (*quoting Copperweld*, 12 CIT at ——, 682 F.Supp. at 569); *see also Mirror Mfrs.*, 12 CIT at ——, 696 F.Supp. at 647–48.

In examining operating losses, the Commissioners did not make a disaggregated analysis of the domestic industry. *See* USITC Pub. 2099 at 10–11 n. 21. Rather, they reasonably included the operating loss data of all firms reporting such losses in order to calculate average losses. In any event, the Commissioners noted that even had they chosen to exclude this data, it would not have changed their conclusions. *Id.*

### C. "By Reason of Imports of the Merchandise"

Pursuant to 19 U.S.C. § 1677(7)(B), Commissioners Eckes and Lodwick assessed the volume and price effects of cumulated imports of Dutch and Japanese brass on the domestic industry. They then concluded that these imports were a cause of material injury.

Plaintiffs submit that the record establishes no causal nexus between Dutch and Japanese imports and any injury the domestic industry may have sustained.

### 1. *Import Volumes*

Commissioners Eckes and Lodwick discussed the significance of the volume of Dutch and Japanese imports. *See* 19 U.S.C. § 1677(7)(C)(i) (1988). Considering these imports cumulatively, the Commissioners found that

> the absolute volume of the subject imports increased from 1984 to 1986, and then declined somewhat from 1986 to 1987, but remained above 1984 import levels. However, as a percentage of domestic consumption, the cumulated imports increased from 5.2 percent in 1984 to 6.6 percent in 1985 and 7.1 percent in 1986, declining only slightly to 6.2 percent in 1987.

USITC Pub. 2099 at 17–18.

Plaintiffs do not contest these data. Rather, they argue that the Commissioners failed to consider rises in domestic production, shipments, and the market share held by the domestic industry and weigh these rises against the cited increases in the market share and volume of cumulated Dutch and Japanese imports. The Commission is, however, presumed to have considered all of the evidence in the record especially where the facts allegedly ignored were presented at an open hearing. *National*

*Ass'n of Mirrors Mfrs. v. United States*, 12 CIT ——, 696 F.Supp. 642, 648 (1988); *see also British Steel Corp. v. United States*, 8 CIT 86, 98, 593 F.Supp. 405, 414 (1984).

Plaintiffs also state that it "strains credulity to conclude that imports averaging a 6.3 percent share of the United States market over a four-year period could cause suppression or depression of pricing by a domestic industry dominating the market with an average of 75.3 percent of domestic consumption." Plaintiffs' Brief at 62.

This argument is unpersuasive because even small volumes of imports may cause price suppression and depression by virtue of underselling. *Negev Phosphates, Ltd. v. United States Dept. of Commerce*, 12 CIT ——, 699 F.Supp. 938, 947–48 (1988). In *Negev*, this court affirmed the Commission's finding that the volume of imports of Belgian and Israeli phosphoric acid was significant, despite accounting for no more than 2.5 percent of total domestic consumption. *Id.* at ——, 699 F.Supp. at 947.

Although the volume of the subject imports may have been relatively small compared to the market share held by the domestic industry, the Commissioners found that based on the increase in the volume of imports both in absolute terms and as a percentage of domestic consumption, Dutch and Japanese brass have "maintained a constant presence in the declining domestic market for brass sheet and strip during the period of investigation." USITC Pub. 2099 at 18. This finding is supported by substantial evidence and is in accordance with law.

### 2. *Price Effects*

Commissioners Eckes and Lodwick examined the price effects of Dutch and Japanese imports. They found the most significant price data to be the quarterly comparisons between non-toll sales of imported and domestic brass sheet and strip. USITC Pub. 2099 at 19. The Commissioners remarked that "quarterly comparisons for non-toll account sales show a consistent and pervasive overall pattern of underselling" resulting in domestic price suppression and depression. *Id.* at 19–20. As evidence for this conclusion, they pointed to the low levels of profitability for the domestic industry even during periods of increasing demand. *Id.* at 20.

Plaintiffs claim as error that: (1) the Commissioners failed to include domestic toll sales in their price comparisons, (2) the record does not support a finding of pervasive underselling of Dutch and Japanese brass, (3) the Commission staff could not confirm allegations of lost sales and revenue to substantiate a finding of underselling of Dutch and Japanese brass, and (4) the Commissioners failed to account for the high quality of Dutch brass.

#### a. Toll and Non–Toll Sales

Plaintiffs assert that the Commissioners' failure to consider domestic toll sales in their comparison between import and domestic prices overemphasizes instances of underselling because a substantial percentage of domestic sales are on a toll basis while almost all sales of Dutch and Japanese brass are non-toll. The plaintiffs also argue that data showing a decline in domestic toll prices do not support the Commissioners' finding of price suppression and depression by Dutch and Japanese brass because of the lack of Dutch and Japanese toll sales.

Toll sales are metal-conversion contracts wherein the purchaser supplies the raw metal, and pays only a fabrication price for the finished brass sheet and strip. *See Wieland Werke, AG v. United States*, 13 CIT ——, 718 F.Supp. 50, 56 (1989); *LMI–La Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, 712 F.Supp. 959, 972, *appeal filed*, 89–1532 (Fed.Cir.1989). Most sales of imported brass are on a non-toll basis whereby the mill provides the raw metal and the price charged includes metal and fabrication costs. *See Wieland*, 13 CIT at ——, 718 F.Supp. at 56.

■ The Commissioners recognized that toll sales of Japanese and Dutch imports were rare. They remarked, however, that unlike prior investigations where the Commission was able to compare price trends in toll and non-toll sales because of the relative stability of copper and zinc prices, considerable fluctuation in metal prices since

1987 made direct comparison of price trends between these two types of sales of little value in this investigation. USITC Pub. 2099 at 19. Accordingly, the Commissioners compared only non-toll sales and considered price trends in domestic toll sales separately.

In the West German brass case, this court upheld the Commission's decision to exclude toll sales from price comparisons. *Wieland*, 13 CIT at ——, 718 F.Supp. at 56–57. In this investigation, the Commissioners could decline to include domestic toll sales in their price comparison analysis when they found that wide variations in the price of raw materials made these data unreliable.

The Commissioners commented that "trends in the delivered prices of toll account sales show a pattern of decline." USITC Pub. 2099 at 19. Plaintiffs point to this statement as support for their position that the decline in domestic sales is not due to Dutch and Japanese imports sold only on a non-toll basis. Plaintiffs' Brief at 61. There is no indication that the Commissioners relied on this comment in reaching their determination. Even if they had relied on it, plaintiffs' argument erroneously assumes that price suppression in toll sales cannot be ascribed to the imported product because the imports do not compete in the toll-account market. *See LMI*, 13 CIT at ——, 712 F.Supp. at 972.

### b. Pervasive Underselling

#### (i) methodology

■ Plaintiffs claim that a "seriously flawed" methodology underlies the data cited by the Commissioners in their finding of pervasive underselling by Dutch and Japanese imports. Plaintiffs also assert that there was no significant price undercutting by the imports because the record shows a pattern of both underselling and overselling.

To support their finding of pervasive underselling, the Commissioners cited evidence showing underselling by Japanese firms in 74 of 100 instances with a margin of underselling ranging as high as 40.5 percent. USITC Pub. 2099 at 19, a–50.

Price comparisons with The Netherlands showed underselling in 51 of 75 instances and a margin of underselling as high as 31.7 percent. *Id.* at 19–20, a–54.

Plaintiffs claim the methodology from which these data were derived incorrectly bases price comparisons on total selling prices rather than fabrication price, includes quarters during which there were few import sales, and quantifies the price comparisons by the number of sales rather than a weighted average accounting for volume of sales. Plaintiffs' Brief at 64 n. 11, Annex A.

The Commission rejected the plaintiffs' arguments for comparing prices using fabrication rather than total selling price:

> evidence indicates that customers base their purchase decisions on quotations for the total selling price of brass sheet and strip rather than on the cost of fabrication alone. Therefore, comparisons of total selling prices appear to be more appropriate than the approach recommended by the respondents.

USITC Pub. 2099 at a–50 n. 1. Plaintiffs attack the Commission rationale, arguing that use of total price is unreasonable because purchasers can seldom make total price comparisons when placing an order due to fluctuation in metal prices, which necessitates separate negotiation of fabrication price and metal price.

The record shows that purchasers are contractually able to fix metal price prior to shipment, for example, by setting the value of brass sheet for a single shipment as of the date of order. *Id.* at a–37–a–38. The record thus supports the Commission's rationale that purchasers consider metal price when making their purchase decision.

Plaintiffs next argue that because lead-times for imports are longer than those for the domestic product, use of total price overstates the amount of underselling because metal prices were increasing during the investigation period. The record shows that metal values were declining at the beginning of the investigation in 1984 to the fourth quarter of 1986, and only began to rise in 1987. *Id.* at a–37.

The Commission has wide discretion in choosing a reasonable analytical methodology. *Negev Phosphates,* 12 CIT at ——, 699 F.Supp. at 951. The Court finds that the Commission reasonably used total price in its price-comparison methodology and that this methodology is supported by evidence on the record.

Plaintiffs object to the Commission's failure to account for variations in sales volumes:

The "instance" count cited by the Commissioners takes into account only product/quarters in which there were both import and domestic industry sales and does not include quarters or products in which there were no import sales at all.

Plaintiffs' Brief at 64 n. 11. The Commission based its price comparisons on the largest quarterly sales. This methodology was the same as that used in *Wieland Werke, AG v. United States,* 13 CIT ——, 718 F.Supp. 50 (1989), *Granges Metallverken AB v. United States,* 13 CIT ——, 716 F.Supp. 17 (1989), and *LMI–La Metalli Industriale S.p.A. v. United States,* 13 CIT ——, 712 F.Supp. 959, *appeal filed,* 89–1532 (Fed.Cir.1989). Plaintiffs have not cited any authority to persuade the Court that the Commission is required to conduct a price comparison analysis accounting for variations in sales volumes. *See Copperweld Corp. v. United States,* 12 CIT ——, 682 F.Supp. 552, 566–67 (1988).

#### (ii) *significance*

■ Under 19 U.S.C. § 1677(7)(C)(ii)(I), the Commission shall consider whether there has been significant price undercutting by the imported merchandise. Plaintiffs claim that the record shows mixed underselling and overselling because price comparison figures show no underselling in many of the sales examined. Plaintiffs argue that under the court's decision in *Copperweld Corp. v. United States,* 12 CIT ——, 682 F.Supp. 552 (1988), there can be no significant price undercutting where, as here, there is a mixed pattern of underselling and overselling.

In *Copperweld,* the court affirmed a negative injury determination where the Com-

mission found no consistent pattern of underselling by Canadian imports. *Id.* at ——, 682 F.Supp. at 565. In contrast, the two Commissioners in this investigation found a pattern of underselling that they characterized as "pervasive."

The Commission has broad discretion to determine the importance of any particular factor it considers. *Id.* at ——, 682 F.Supp. at 562; *Maine Potato Council v. U.S.,* 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). Instances of overselling do not preclude the Commission from finding significant or pervasive underselling. *See, e.g., Negev Phosphates,* 12 CIT at ——, 699 F.Supp. at 948; *Hercules, Inc. v. United States,* 11 CIT ——, 673 F.Supp. 454, 481 (1987).

Plaintiffs further allege that the record shows no pattern of downward price leadership by the imports. Plaintiffs claim that the Commissioners failed to evaluate the pattern of price leadership in their consideration of price undercutting as required by the decision in *Maverick Tube Corp. v. United States,* 12 CIT ——, 687 F.Supp. 1569 (1988). Plaintiffs' Brief at 65. *Maverick* contains no such requirement. Rather, it discusses price leadership as a factor the Commission may consider. *Id.* at ——, 687 F.Supp. at 1578.

The Commissioners' finding of pervasive underselling is in accordance with law and is supported by evidence in the record showing underselling of Japanese imports in 74 percent and Dutch imports in 68 percent of the instances examined. USITC Pub. 2099 at a–50, a–53.

#### c. Lost Sales and Revenues

Plaintiffs claim that if there were pervasive underselling by Dutch and Japanese imports, the Commission staff would have been able to confirm the domestic producers' allegations of lost sales and revenues.

While evidence of lost sales and revenue may be probative on the issue of causation, the lack of such evidence will not vitiate a Commission determination. *USX Corp. v. United States,* 11 CIT ——, 655 F.Supp. 487, 491 (1987). Here, the Commissioners based their causation findings on volume

and price effects of the subject imports, not on lost sales and revenues.

### d. Differences in Quality of Merchandise

Plaintiffs argue that Metallverken Nederland manufactures brass sheet and strip of a quality superior to the domestic product, and this superior quality "significantly diminishes the degree to which the Metallverken product competes with the domestic product, further reducing any possibility of suppression or depression as to the prices of domestic producers." Plaintiffs' Brief at 69.

The Commissioners considered this argument but, because of the pervasive pattern of underselling, were unpersuaded that the Dutch product was not a cause of domestic price suppression. USITC Pub. 2099 at 20. The Commissioners noted that while higher quality "would normally imply that a price premium would be paid," such a premium was not evident in the price data. *Id.*

Plaintiffs' argument was also raised and rejected with respect to cumulation of West German and Swedish imports in other brass sheet and strip cases. As this court previously stated:

> Although quality appeared to be a major factor in purchaser's decisions, price was also a major factor. It is not unreasonable for the Commission to find that domestic purchasers prefer to purchase higher quality goods that are available at a cheaper price than domestic goods or other imports perceived to be inferior. "Competition" consists of rivalry in the marketplace, where goods will be bought from those who, in view of buyers, provide "the most for the money."

*Granges Metallverken*, 13 CIT at ——, 716 F.Supp. at 22; *see also Wieland Werke*, 13 CIT at ——, 718 F.Supp. at 54.

### 3. *Other Evidence of Record*

Plaintiffs claim that Commissioners Eckes and Lodwick failed to consider factors unrelated to Dutch and Japanese imports as causes of material injury. These factors are increases in metal prices, competition among the domestic producers, product substitutes resulting in declining demand, and imports from countries other than The Netherlands and Japan.

The Commissioners are presumed to have considered all record evidence. *National Ass'n of Mirror Mfrs. v. United States*, 12 CIT ——, 696 F.Supp. 642, 648 (1988). Moreover, the Commissioners did recognize that other factors may be causing injury. USITC Pub. No. 2099 at 16–17.

Plaintiffs argument also does not eliminate Dutch and Japanese imports as a cause of material injury. The Commission is not to weigh causes of injury, but is to determine whether the dumped imports contribute to material injury. *Wieland Werke*, 13 CIT at ——, 718 F.Supp. at 56; *Granges Metallverken*, 13 CIT at ——, 716 F.Supp. at 24–25; *Citrosuco Paulista S.A. v. United States*, 12 CIT ——, 704 F.Supp. 1075, 1101 (1988). Accordingly, the imports under investigation need not be the only cause of harm. *Wieland Werke*, 13 CIT at ——, 718 F.Supp. at 56; *Florex v. United States*, 13 CIT ——, 705 F.Supp. 582, 593 (1989). Although they recognized the existence of other factors, the Commissioners found that the subject imports contributed to the harm experienced by the domestic industry. *Id.* at 17.

The Court finds the Commissioners' causation analysis to be supported by the record and in accordance with law. Plaintiffs have offered alternative interpretations of the evidence, but have failed to show that this analysis does not rest upon "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir.1984) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

### D. Burden of Proof

In the conclusion of their determination, Commissioners Eckes and Lodwick state "we are not persuaded that the imports under investigation were not a cause of material injury to the domestic industry." USITC Pub. 2099 at 21. Plaintiffs argue that this statement indicates the Commissioners improperly shifted the burden of

proof to the plaintiffs to show that imports were not a cause of material injury.

At the beginning of their causation analysis, the Commissioners stated that the Commission "is to determine whether imports subject to investigation are a cause of material injury, as defined by the statute." *Id.* at 16–17; *see* 19 U.S.C. § 1677(7)(A) (1988). Their ensuing analysis demonstrates that the Commissioners based their finding on evidence that the imports were a cause of material injury rather than being unpersuaded to the contrary.

The Court holds that the material injury determination of Commissioners Eckes and Lodwick is supported by substantial evidence on the record and is otherwise in accordance with law.

## III. THREAT OF MATERIAL INJURY DETERMINATION

Since they found material injury, Commissioners Eckes and Lodwick did not provide a separate threat analysis. Of the four remaining commissioners, only Commissioner Rohr found a threat of material injury to a domestic industry.

Plaintiffs challenge Commissioner Rohr's threat determination on four grounds: (1) the Commissioner improperly analyzed the impact of Dutch and Japanese imports jointly, (2) the determination is unsupported by substantial evidence on the record and is not in accordance with law, (3) the Commissioner never determined that any threat of material injury was real and imminent, and (4) the "but for" analysis was based on a material mistake of fact.

### A. Analysis of Joint Impact

■ Under 19 U.S.C. § 1677(7)(C)(iv), the Commission must cumulate the volume and price effects of imports in its material injury analysis when the imports compete with each other and with the domestic like product. *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT ——, 693 F.Supp. 1165, 1171 (1988) (*Aso-*

*colflores I*). Although this provision does not cover a threat determination, case law permits cumulation in "appropriate threat of material injury investigations." *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT ——, 704 F.Supp. 1068, 1070 (1988) (*Asocolflores II*); *Asocolflores I*, 12 CIT at ——, 693 F.Supp. at 1172 (in threat determinations, the Commission is not prohibited from cumulating in appropriate cases).[1]

Noting the court's decision in *Asocolflores I*, Commissioner Rohr stated:

> I do not feel that cumulation, *at least cumulation in the formal sense* it is used by the Commission in the evaluation of causation in a present injury analysis, is proper in the context of threat.

USITC Pub. 2099 at 32 n. 11. (emphasis added). He chose, however, to consider the effects of Japanese and Dutch imports jointly, explaining:

> I also recognize that situations may arise in which each of two countries might have potential impacts on the domestic industry which do not individually threaten the industry, but which when they occur simultaneously, do have such a sufficiently large injurious impact. This is not *formal cumulation* because I do not try to cumulate the individual components of the statutory threat factors. I am making an individual assessment of the potential impact of each country and only then considering joint impacts.

*Id.* (emphasis added).

Plaintiffs argue that "[h]aving already clearly decided ... that cumulation in the context of threat would not be appropriate, Commissioner Rohr's only option was to consider the impact of imports from The Netherlands and the impact of imports from Japan separately." Plaintiff's Brief at 85. Plaintiffs allege, therefore, that the Commissioner abused his discretion when he chose to "chart a new path, disregarding past agency practice, to initiate a new

---

**1.** While this case is governed by prior law, the Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100–418, 102 Stat. 1107 (1988) permits the Commission in investigations after August 23, 1988 to cumulate where practicable in a threat analysis if the basic conditions for cumulation for material-injury investigations exist.

practice of considering imports 'additively.'" *Id.* at 84.

The Commissioner did not decide that cumulation in the context of threat was inappropriate. Rather, the Court understands the Commissioner's statement to mean that he was unable to cumulate in the formal sense of a material injury analysis, as is set forth in the statute. USITC Pub. 2099 at 32 n. 11.

The plaintiffs' second argument that the Commissioner engaged in something other than a cumulative analysis is unpersuasive. Irrespective of the label attached to this analysis, by assessing the effects of the imports together, the Commissioner cumulated in the context of a threat analysis, which the *Asocolflores* cases held to be permissible when appropriate.

Plaintiffs next submit that cumulation in this instance is an abuse of discretion because, under the contributing effects standard used by the Commission prior to enactment of the cumulation statute in 1984, there has to be a showing that the intent and capability of Japan and The Netherlands to increase exports to the United States was comparable. Plaintiff's Reply at 29, 33–34; Tr. 120. Plaintiffs offer no convincing authority for requiring application of pre–1984 Commission practice regarding cumulation in material injury analyses to cumulation in the threat context employed in an investigation commenced in 1987.

The question remains whether the Commissioner properly considered the joint impact of the Dutch and Japanese imports under the circumstances of this investigation. *Asocolflores I* states that "cumulation cannot be used for all phases of the threat investigation," and lists several of the statutory threat factors in which cumulation may not be feasible. *Asocolflores I,* 12 CIT at ——, 693 F.Supp. at 1172. The Commissioner recognized that certain threat factors were not amenable to cumulation. He states:

> I do not try to cumulate the individual components of the statutory threat factors. I am making an individual assessment of the potential impact of each

country and only then considering joint impacts.

*Id.* Thus, the Commissioner did not jointly assess those factors he found were not proper for cumulation in this case.

The Court holds that the Commissioner did not abuse his discretion in assessing the effects of Dutch and Japanese imports jointly in his threat analysis.

### B. Statutory Threat Factors

■ The plaintiffs also contest the Commissioner's analysis of market penetration, productive capacity, price suppression and depression, capacity utilization, and product-shifting under 19 U.S.C. § 1677(7)(F)(i).

As it deals with the projection of future events, a threat analysis is inherently less amenable to quantification than the material injury analysis. *Hannibal Indus. v. United States,* 13 CIT ——, 710 F.Supp. 332, 338 (1989); *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 59, 592 F.Supp. 1318, 1329 (1984).

Commissioner Rohr began his threat analysis with an evaluation of the condition of the domestic industry. He found that the domestic industry, while not experiencing material injury, was "not very profitable" and was "extremely vulnerable" to the extent that whether Dutch imports alone would cause material injury was a "close question." USITC Pub. 2099 at 34–35. In light of this perceived extreme vulnerability, the Commissioner evaluated the economic factors the Commission is directed to consider under 19 U.S.C. § 1677(7)(F)(i). He concluded that the combined effect of Japanese and Dutch imports constituted a threat of material injury. He based this determination on five factors: (1) increases in market penetration rising to an injurious level, (2) increases in foreign capacity likely to result in a significant increase in imports to the United States, (3) price suppression or depression of the domestic product, (4) underutilized foreign capacity, and (5) the capability of shifting production.

#### 1. *Increase Market Penetration*

##### a. Rapid Increase

Under 19 U.S.C. § 1677(7)(F)(i)(III), the Commission is directed to consider "any

rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level...." Here, the Commissioner stated that:

> I cannot characterize the increase in market penetration of either country as rapid. Japanese import penetration did increase steadily from 1984 to 1986 before falling slightly in 1987 and considerably in the interim period. Dutch import penetration rose from 1984 to 1985 before falling slightly in 1986 and even more slightly in 1987. I also note, however, that 1987 figures may have been affected by the suspension of liquidation and preliminary duties that went into effect in September of 1987.

USITC Pub. 2099 at 33.

Plaintiffs argue that in order for increased market penetration to serve as a factor supporting an affirmative threat determination, 19 U.S.C. § 1677(7)(F)(i)(III) requires the increase to be rapid. Since the Commissioner found that the increase in Japanese and Dutch penetration was not rapid, plaintiffs assert that his reliance on this factor is contrary to law.

The Commission has considerable discretion to consider factors in its threat analysis other than those listed under 19 U.S.C. § 1677(7)(F)(i). That provision states:

> In determining whether an industry in the United States is threatened with material injury ... the Commission shall consider, *among other relevant economic factors....*

19 U.S.C. § 1677(7)(F)(i) (1988) (emphasis added). Additionally, 19 U.S.C. § 1677(7)(F)(i)(VII) permits consideration of "any other demonstrable adverse trends." Therefore, the Commissioner could consider an increase in market penetration in making his determination.

Plaintiffs also assert that the record does not support a finding of threat based in part on increased import penetration. The Court disagrees. The record shows that United States consumption of combined Dutch and Japanese imports rose in volume from 5.2 percent in 1984 to 7.1 percent in 1986, thereafter falling to 6.6 percent in 1987. *Id.* at a–35. Thus, while import penetration decreased in the last year of the investigation, the record shows a rise over the preceding three-year period. In addition, the import penetration level in 1987, while falling, was still higher than in 1984.

### b. Date of Suspension of Liquidation

In an attempt to explain the 1987 decrease in domestic market penetration by Dutch and Japanese imports, the Commissioner stated that the figures "may have been affected by the suspension of liquidation and preliminary duties that went into effect in September of 1987." USITC Pub. 2099 at 33. Suspension of liquidation actually occurred in February 1988. Plaintiffs argue that this misstatement is a material mistake of fact requiring a remand. The government and defendant-intervenors counter that the Commissioner did not rely on this factor and the error is harmless.

Import levels may drop following an affirmative preliminary dumping determination because liquidation of entries is suspended and importers must deposit estimated duties. *See* 19 U.S.C. § 1673b(d) (1988). Thus, the date of suspension of liquidation may be a significant factor in an analysis of market penetration. The Court is, however, unable to ascertain to what extent the Commissioner relied on this factor in his analysis and whether his conclusion would have been different had he known the actual date of suspension of liquidation. Therefore, the government's argument may be only a post-hoc rationalization. The Court remands to reconsider market penetration by the imports in light of the suspension of liquidation in February 1988. *See Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir.1976) (a remand is appropriate when "the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture").

### 2. *Productive Capacity*

While the Commissioner cautioned that capacity figures available on Dutch and Japanese brass producers were not very probative as to production limits due to the

ease of shifting production from other brass products, he found a total increase in Japanese capacity of about six percent between 1984 and the end of 1987. USITC Pub. at 32–33. Thereafter, Japanese capacity decreased 1.88 percent in the first quarter of 1988 compared to the same period in 1987. *Id.* at a–30. The Commissioner noted that while the overall increase was very moderate, "it is ... clear that, given the overall decline in Japanese home market sales, the increase must be devoted to exports, either to the United States or other foreign countries." *Id.* at 33. The Commissioner also stated that Dutch capacity remained stable until 1987 when there was a small increase, but that Dutch home-market sales increased steadily. *Id.*

Plaintiffs do not contest the Commissioner's finding of expansion in Japanese productive capacity during the first four years of the investigation and in Dutch capacity in 1987. Rather, they challenge the significance of the increases. As previously stated, the Commissioner has broad discretion to determine the significance of the factors he considers. *Copperweld Corp. v. United States*, 12 CIT ——, 682 F.Supp. 552, 562 (1988); *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). The Court finds that the Commissioner did not abuse his discretion in considering these increases as a factor in his affirmative determination.

Plaintiffs' assert that it was speculative to conclude that increases in Japanese capacity would be devoted to additional exports. The Court notes that when Japanese capacity expanded there was a concurrent overall increase in exports. Conf.R. 48 at A–43–A–44. Given this increase and the total decrease in Japanese home-market sales of approximately eight percent from 1984 to 1987, the Commissioner could reasonably assume that expanded Japanese capacity would be devoted to exports. *See* USITC Pub. 2099 at a–30.

Plaintiffs also claim:

There is absolutely no evidence in the record which indicates that any increase in Japanese exporters' capacity would re-

sult in increased exports of the subject merchandise to the United States.

To the contrary, there is evidence in the record to indicate that the Japanese exporters' unused capacity would be directed at the burgeoning Asian electronics assembly markets, not at the United States market.

Plaintiffs' Brief at 92. The government counters that the percentage of Dutch and Japanese brass devoted to the United States market remained fairly stable, which indicated that a portion of the increase in exports would go to the United States. Defendant's Brief at 53.

Evidence in the record may support either the plaintiffs' or the government's positions. *See, e.g.*, USITC Pub. 2099 at a–29; Conf.R. 48 at A–43, A–44, Tables 11–12. The Commissioner, however, never explicitly stated whether an increase in exports resulting from expanded Japanese capacity will be sent to the United States market. Rather, he stated only that increased exports "must be devoted *either* to the United States *or* other foreign countries." *See* USITC Pub. 2099 at 33 (emphasis added).

As suggested by the government, the Court might infer that the Commissioner concluded some additional Japanese exports would go to the United States. Defendant's Brief at 53. Should an affirmative threat determination be based in part on this factor, it would be better practice to have an explicit statement on this issue rather than leaving the Court to make this inference. As the Court is remanding this determination for reconsideration of market penetration, the Court also requests an explicit statement with some analysis whether increased capacity is likely to result in a significant increase in exports to the United States.

3. *Price Depression and Suppression*

Under 19 U.S.C. § 1677(7)(F)(i)(IV), the Commission is directed to consider:

the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise.

Plaintiffs challenge the Commissioner's analysis of underselling by the imports, and a rise in 1987 domestic prices.

### a. Underselling

The Commissioner found that the data on the Japanese brass industry show "a consistent pattern of underselling." USITC Pub. 2099 at 33. Plaintiffs contest this finding, but offer identical arguments used against the finding by Commissioners Eckes and Lodwick of pervasive underselling by Japanese imports. Moreover, these findings are based on the same evidence. As the Court stated with respect to pervasive underselling, instances of overselling do not preclude the Commission from finding a consistent pattern of underselling. *Supra* at 739.

Unlike Commissioners Eckes and Lodwick who found that Dutch imports also showed a pattern of pervasive underselling, Commissioner Rohr stated that data for the Dutch was "mixed, showing consistent underselling for some products and consistent overselling for others." *Id.* Plaintiffs again argue that under *Copperweld Corp. v. United States*, 12 CIT ——, 682 F.Supp. 552 (1988), there can be no price suppression or depression of domestic prices when imports show a mixed pattern of overselling and underselling. The Court disagrees with the plaintiffs' characterization of the holding in that case. *See supra* at 23. *Copperweld* upheld a negative material-injury determination when the Commission found no consistent pattern of underselling. *Copperweld*, 12 CIT at ——, 682 F.Supp. at 565.

Here, the Commissioner found the domestic industry to be extremely vulnerable. USITC Pub. 2099 at 32. Since Commissioner Rohr has broad discretion to determine the significance of the factors he considers, *Copperweld*, 12 CIT at ——, 682 F.Supp. at 564, the Court holds that, in this instance, he could find that a mixed pattern of underselling and overselling by Dutch imports could have a suppressive or depressive effect on domestic prices.

### b. Decline in Domestic Fabrication Prices

The Commissioner noted a substantial rise in domestic prices in 1987 despite the presence of the dumped imports. He discounted this rise, however, stating that these data were misleading:

[t]he prices include the raw metals price, which is essentially a pass through on the selling price. While difficult to gauge, it seems possible that the fabrication price, that is the price charged for fabricating the brass sheet and strip from the basic brass did not increase or may actually have decreased in 1987.

USITC Pub. 2099 at 33 (footnote omitted).

Plaintiffs claim that the Commissioner erred in assuming that fabrication prices may have declined because the record shows a increase in non-toll fabrication prices and, therefore, the imports could have no suppressive or depressive effect on domestic prices.

The Commissioner considered the rise in domestic prices but dismissed it as non-probative. The record supports the Commissioner's analysis. Evidence shows that the price of metal increased 70 percent from the last quarter of 1986 through the first quarter of 1988. Conf.R. 48 at A–53; *see also* Conf.R. 36 at Exhibit 12. The record also shows that the increase in 1987 non-toll selling prices is attributable primarily to passing through increases in metal costs rather than to any change in fabrication costs. Conf.R. 48 at A–58, A–62. There is also evidence that toll prices, which are based mainly on fabrication costs, declined in 1987, and that domestic gross profit margins were lower in 1987 than in 1984 despite higher prices. *Id.* at A–60, Table 16; USITC Pub. 2099 at a–21, Table 6.

### 4. *Capacity Utilization*

The Commissioner considered Japanese and Dutch capacity utilization and found that "there appears to be substantial and increasing underutilization by the Japanese industry, while the Dutch industry is operating at extremely high capacity utilization rates." USITC Pub. 2099 at 33.

Plaintiffs again argue that the record shows no evidence that any portion of un-

used Japanese capacity will be directed at the United States market. The Court has already addressed this issue *supra* at 37–38, and requests a more explicit statement on this point.

### 5. *Product Shifting*

Under 19 U.S.C. § 1677(7)(F)(i)(VIII), the Commission must consider:

the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to [dumping] investigation(s) ... or to final [antidumping] orders ..., are also used to produce the merchandise under investigation.

Notwithstanding high Dutch capacity utilization, Commissioner Rohr stated that:

The Dutch company in this investigation is the subsidiary of a Swedish company and Swedish exports to the United States are covered by a recently issued dumping duty. While counsel denied any product shifting, that is not the point. There is no evidence that the company does not possess the *capability* of servicing customers from either facility. This would free additional production from the Dutch company for export to the United States.

USITC Pub. 2099 at 33–34 n. 14.

Citing testimony of an executive of Metallverken Nederland, plaintiffs allege that a shift in production from the Swedish parent to the Dutch subsidiary is "sheer speculation." *See* R. 21, at 110. The testimony of a witness is not dispositive. The Commission has authority to weigh all evidence relevant to intent and to reject the testimony of representatives of interested parties when warranted. *American Permac, Inc. v. United States*, 10 CIT 719, 724, 656 F.Supp. 1228, 1233 (1986), *aff'd* 831 F.2d 269 (Fed.Cir.1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988).

The Commission must consider the potential for product shifting when production facilities owned by a foreign company can produce a product subject to an antidumping duty order and produce the imports under investigation. 19 U.S.C.

§ 1677(7)(F)(i)(VIII) (1988). Metallverken Nederland is the subsidiary of a Swedish company, Metallverken AB. USITC Pub 2099 at a–29. Exports of brass sheet and strip to the United States by the Swedish parent are subject to an antidumping order. *Id.* The Commissioner could, therefore, conclude that Metallverken had the capability to shift production.

Plaintiffs assert that under 19 U.S.C. § 1677(7)(F)(i)(VIII), the Commission is to determine the *potential* not the capability for product shifting. The fact that the Commissioner did not use the precise statutory language is not fatal to his determination. *Negev Phosphates, Ltd. v. United States Dept. of Commerce*, 12 CIT ——, 699 F.Supp. 938, 947 (1988); *American Spring Wire Corp. v. United States*, 8 CIT 20, 23, 590 F.Supp. 1273, 1277 (1984), *aff'd sub nom. Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985).

### 6. *Other Factors*

Finally, plaintiffs allege that the statutory factor dealing with domestic inventories does not support an affirmative threat determination. Commissioner Rohr considered this factor but explicitly dismissed it as not being significant. USITC Pub. 2099 at 33. While 19 U.S.C. § 1677(7)(F)(i) directs the Commission to *consider* the listed relevant economic factors, there is no requirement that an affirmative determination be based upon an affirmative finding as to all the factors. *National Ass'n of Mirror Mfrs. v. United States*, 12 CIT ——, 696 F.Supp. 642, 645 (1988).

### C. Real and Imminent Threat of Material Injury

An affirmative material injury determination, must "be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent." 19 U.S.C. § 1677(7)(F)(ii) (1988). The Commissioner concluded that:

Evaluating all the evidence together, I conclude that the Japanese industry *could easily send* substantially greater quantities of imports to the United States at prices that would have a signifi-

cant price depressing or suppressing effect. I further conclude that the Dutch industry could also send additional quantities of brass sheet and strip to the United States, although in much smaller quantities than the Japanese. Such imports will have some, though smaller suppressive effects than the Japanese products.

Finally, I must evaluate whether the projected effect of these imports is likely to be injurious, that is lead to conditions in the domestic industry that would properly be characterized as material injury. I note that the condition of the domestic industry is extremely vulnerable to material injury. In the context of that condition, I conclude that the projected impact of Japanese imports *could easily push* the domestic industry over the line into material injury. Standing alone, the projected impact of Dutch imports might not have such an effect. The small increase and the small price effects might not push even the vulnerable industry across the line. This is, admittedly, a close question.

USITC Pub. 2099 at 34 (emphasis added).

Plaintiffs argue that a finding that Dutch and Japanese producers "could easily send" increased exports to the United States which "could easily push the domestic industry over the line into material injury" does not indicate that the increase in imports was real and imminent. Plaintiffs claim that the Commissioner found, at most, the mere possibility of injury at some remote time in the future.

Although the Commissioner did not use the term "real and imminent," he need not use the precise statutory language in his findings as long as the basis of his determination is reasonably discernable. *Negev Phosphates, Ltd. v. United States Dept. of Commerce*, 12 CIT ——, 699 F.Supp. 938, 947 (1988); *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, 704 F.Supp. 1075, 1094 (1988); *American Spring Wire Corp. v. United States*, 8 CIT 20, 23, 590 F.Supp. 1273, 1277 (1984), *aff'd sub nom. Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985); *British Steel Corp. v. United States*, 8 CIT 86, 98, 593 F.Supp. 405, 414 (1984).

The Commissioner stated that he was to determine whether the effect of the imports is "likely to be injurious" and that the threat must occur "within a reasonably imminent time frame," USITC Pub. 2099 at 32, 34. These statements and the ensuing analysis may be sufficient for the Court to infer that the Commissioner found the threat to be real and imminent. Since the Court has already ordered a remand which may affect this question and in order to eliminate any possible doubt as to the Commissioner's meaning, the Court requests a more specific statement whether there is a real and imminent threat of material injury.

### D. "But For" Analysis

 As required by 19 U.S.C. § 1673d(b)(4)(B), Commissioner Rohr stated he would have found material injury "but for" the suspension of liquidation of entries of the dumped imports, but again misstated the date of the suspension of liquidation. USITC Pub. 2099 at 34. *See supra* at 743. Plaintiffs claim that Commissioner Rohr's affirmative "but for" finding is, therefore, based on a material mistake of fact.

The statute requires a "but for" analysis in the event the Commission finds no material injury but concludes that a threat of material injury exists. 19 U.S.C. § 1673d(b)(4)(B) (1988). The purpose of this requirement is to determine whether Commerce is to impose antidumping duties from the date of suspension of liquidation or from publication of the final affirmative Commission determination. *See* 19 U.S.C. § 1673e(b) (1988).

When an affirmative Commission determination consists of a combination of affirmative votes on material injury and threat, coupled with an affirmative "but for" finding, the statute provides that antidumping duties are to be imposed as of the date of suspension of liquidation. 19 U.S.C. § 1673e(b)(1) (1988). The statute and the legislative history are, however, silent on how Commerce is to proceed under this scenario in the event of a negative "but for" finding. *See* S.Rep. No. 249,

96th Cong., 1st Sess. 76–77, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 462–63. In such a case, Commerce's practice is to disregard the "but for" finding when less than a majority of the affirmative votes were based on a finding of threat of material injury, and to impose antidumping duties from the date of suspension of liquidation. *See, e.g., Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Italy, Japan, Singapore, and The Federal Republic of Germany* 54 Fed.Reg. 25,313–17 (June 14, 1989) (Commerce antidumping order); 54 Fed.Reg. 24,430, 24,431 n. 6 (June 7, 1989) (Commission determination); *Light–Walled Rectangular Pipes and Tubes From Argentina,* 54 Fed.Reg. 22,794 (May 26, 1989) (Commerce antidumping order); 54 Fed. Reg. 22,635 (May 25, 1989) (Commission determination); *Frozen Concentrated Orange Juice From Brazil,* 52 Fed.Reg. 16,-426 (May 5, 1987); 52 Fed.Reg. 15,566 (April 29, 1987); *Certain Welded Carbon Steel Pipes and Tubes From Turkey,* 51 Fed.Reg. 7,984 (March 7, 1986) (Commerce antidumping order against Turkish imports); 51 Fed.Reg. 7,342 (March 3, 1986) (Commission determination); 50 Fed.Reg. 50,821 (Dec. 12, 1985) (Commerce antidumping order against Thai imports). Following this practice, Commerce would impose the antidumping duties as of the date of suspension of liquidation regardless of the outcome of Commissioner Rohr's "but for" finding.

While plaintiffs argue Commerce's practice is an abuse of discretion, this Court must accord a high degree of deference to an agency's interpretation of the statutes it administers. *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir.1986) ("substantial weight"); *Smith–Corona Group, Consumer Prods. Div., SCM Corp. v. United States,* 713 F.2d 1568, 1582 (Fed. Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984) ("tremendous deference").

Given the lack of a discernable legislative intent, the Court finds that Commerce's practice in assessing antidumping duties under 19 U.S.C. § 1673e(b) based upon the findings of a majority of the affirmative votes in the event of a negative "but for" finding, is reasonable and not an abuse of discretion. Therefore, the Court holds that Commissioner Rohr's mistake of fact on the date of the suspension of liquidation in his "but for" analysis is harmless error.

## CONCLUSION

The Court remands for reconsideration of the determination in a manner consistent with this opinion. The Commission shall file its remand determination with the Court within 30 days. Plaintiffs and the defendant-intervenors are granted 20 days to file comments on the remand determination. The Commission may respond to any comments filed within 10 days.